## Krusinski, Appellant, v. Chioda.

Argued September 29, 1958. Before JONES, C. J., BELL, MUSMANNO, JONES and COHEN, JJ.

*Theodore M. Tracy*, with him *Edward O. Spotts* and *George Y. Meyer*, for appellants.

*George M. Weis*, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, November 10, 1958:

The jury in this case returned money verdicts in favor of the plaintiffs, Richard Krusinski, Anna Krusinski, and Joseph Krusinski against John J. Chioda.

The Court of Common Pleas of Allegheny County ordered a new trial on the ground of inadequacy of the verdicts. The defendant Chioda appealed to the Superior Court which reversed the order of the lower Court and affirmed the verdicts. We granted allocatur.

From the plaintiffs' evidence and the jury's verdict the following recital of facts is authorized. On the night of September 21, 1954, at about 11 o'clock, Joseph Krusinski, then 19 years of age, with his brother Richard, 14, in the front seat with him, was driving his Oldsmobile automobile westwardly on Irvine Street in Pittsburgh. As he arrived at a point opposite his home on the north side of Irvine Street, he proceeded to make an incomplete U turn which would allow him, facing toward the east, to park in front of his dwelling. He thus drove to the left or south side of the highway and then cut back sharply, heading for the north curb of Irvine. While doing this he noted that he could not negotiate the complete turn, which would enable him to be facing the east, because of another car already parked on the north side of Irvine. He stopped, right angularly, to the curb, to contemplate his next maneuver, particularly because he now saw a car coming from the west, and he wished to avoid any movement which could bring him into the path of this eastbound car. While momentarily in this stationary position he saw the lights of another car, only a couple of blocks away, bearing down on him from the east. It was travelling at a speed, later estimated by others, to be from 70 to 75 miles an hour. This speeding car (a Mercury, owned by Joseph J. Chioda) crashed into Joseph's car, demolishing its right center, and inflicting injuries on both Joseph and Richard.

Richard and Joseph, acting through their mother-guardian, Anna Krusinski, brought suit against Chioda who, in turn, brought Joseph on the record as an additional defendant. By the time of the trial, Joseph had attained his majority, so that in all further proceedings he acted in his own name and right. Joseph's account of the accident was corroborated by the occupants of the car which, driven by Esther Chernotowich, was travelling eastwardly at the time of the collision. Miss Chernotowich and the four passengers all testified that Joseph's car was at a standstill just before the impact, and Miss Chernotowich testified further that Chioda's car was proceeding at a speed of from 70 to 75 miles an hour as it crashed into the stationary Oldsmobile.

It is inexplicable, except by concluding that Chioda was operating his car with a negligence which amounted almost to sheer recklessness, as to why he would drive directly ahead into an automobile broadside in his path and lighted up by its headlights and tail lights as well as by an overhead arc light. Nor could Chioda himself offer any reasonable explanation as to why he did not see Joseph's car until he was about 20 feet from it, and then "it was too late to do anything."

Chioda testified that he was travelling between 30 and 35 miles per hour. When asked: "Can you tell us where he [Joseph] came from, or anything like that?" he replied: "No, I can't."

It was stipulated Joseph expended $753 to repair his car. His loss of wages and medical expenses amounted to $406.25 so that his out-of-pocket expenses totaled $1159.25. But, while the jury found Chioda negligent and Joseph free of negligence, it awarded Joseph only $950 in damages. This verdict was thus not only less than Joseph's monetary loss, but it gave no heed to the item of pain, suffering, and inconven-

ience, and obviously ignored the doctor's testimony that Joseph had suffered a cerebral concussion, muscle pain and spasm, and that his back condition would "tend to become chronic." The doctor testified also that as a bricklayer, Joseph would have to wear "a belt or some elastic form of a brace to support his back while he was working."

In the case of *Todd v. Bercini*, 371 Pa. 605, 607, the jury awarded the plaintiff $2,070.43, the amount of the medical bill, but nothing for pain, suffering, and inconvenience, lost wages, or impairment of earning power. The trial court ordered a new trial because of inadequacy of verdict. The defendant appealed. In holding that the court had not abused its discretion in making this order, we said: "A trial is a systematized, organized procedure for determining the truth and awarding justice with precision, to the extent that precision can be ascertained through fallible human agencies. A trial is not to be a mere conscious *approximation of reality*. It is not the province of a jury to decide *generally* the issue presented to it for decision, in the spirit of boundless generosity or restrained benevolence. If Mrs. Todd was entitled to a verdict from the defendant because of the injuries he inflicted upon her as the result of his negligence, she was entitled to *all* that the law provides in such a case. And the items of pain, suffering and inconvenience, as well as loss of wages and impairment of earning power, are inevitable concomitants with grave injuries when suffered by a wage-earner. A jury may not eliminate pain from wounds when all human experience proves the existence of pain, and it may not withhold lost wages when the evidence in the case uncontradictedly establishes the loss of wages as the result of the negligence which they, the jury, have adjudicated against the responsible defendant. When it is apparent that

a jury by its verdict holds the defendant responsible for a whole loaf of bread, it may not then neglectfully, indifferently, or capriciously cut off a portion of that loaf as it hands it to the plaintiff."

The jury in this case sliced away even a larger portion of the loaf it passed over to Richard than the truncated one it handed to Joseph. Richard was sitting on the right-hand side of Joseph's car and thus received the full impact of the momentum of Chioda's car which crashed into it at 75 miles an hour. He not only sustained multiple bruises on chest, arms and legs, but his foot was so pinned in the wreckage that for over an hour he could not be extricated, being finally released only when an acetylene torch burned away the imprisoning metal. In the meantime he was suffering the pain and agony of a fractured jaw. The gravity of the fracture is evident from the doctor's testimony that 12 days were required to prepare the patient for the operation which resulted in the youth's mouth being wired and clamped for 58 days during which time he could take only liquids. Even at the time of the trial (32 months after the accident) Richard was still suffering from the effects of the broken jaw. The doctor testified: "We felt that there should be some reconstructive work, some prosthetic work done with both the upper and lower jaws, because the teeth had been involved and moved to some degree, and, of course, we are trying all along, and our prime purpose is to re-establish two things, first, the aesthetics or appearance and, second, of course, the function of chewing. We are trying to establish those two things all the time."

The reconstructive work mentioned by the doctor involves the removal of several front teeth and their being replaced with false teeth: "The portion that we primarily are thinking of involves right in front, the

part from the corner to the front of his mouth. The surgery, the extractions would be necessary to be performed and the replacement, the prosthetic appliance replacing them."

Although Richard was only 14 years of age at the time of the accident, an age when augmentation in weight is quite a normal development, he lost 24 pounds during the two months succeeding the infliction of injuries and he was still underweight at the time of the trial. Considering the intense pain and suffering to which he was subjected and will still have to undergo, and the fact that he will need to wear false teeth in the front of his mouth for the rest of his life, it is quite evident that the Court below was eminently justified in concluding that the verdict of $1500 awarded Richard was inadequate. Especially, in view of the fact that the defendant did not dispute the plaintiff's medical evidence even though a doctor, on behalf of the defendant, examined Richard. This was also true with regard to Joseph.

Mrs. Krusinski was awarded $500, although her out-of-pocket expenses amounted to $907.60. Since she had nothing to do with the crash of the cars, why did the jury penalize her by awarding her $407.60 less than the amount she actually expended? What accounted for this bizarre verdict?

The Trial Judge said that the jury "could have become confused because of the dual defenses, diametrically opposed to each other, which were submitted to the jury." And now we come to a rather unique feature of this case. We will recall that both plaintiffs, Richard and Joseph Krusinski, the defendant Chioda himself, and the five disinterested witnesses in the Chernotowich car all testified that the accident occurred when Joseph's car, sitting motionlessly across the highway, was struck by Chioda's.

In spite of this unanimous testimony as to how the crash occurred, Chioda called to the witness stand a Joseph S. Doyle who related a completely different story. He said that he was sitting in his 1953 Plymouth station wagon on Tullymet Street overlooking Irvine Street (about 5 or 6 blocks from 93 Irvine Street) when he saw Chioda's and Joseph's cars "fly by" on Irvine Street travelling westwardly at 75 miles an hour. They were only an arm's length from each other and were engaged in a race, hurtling by neck to neck. He decided to follow them. By the time he got his car turned on to Irvine Street he was a block behind the racing cars which were now tearing ahead at 90 miles an hour over the two car tracks in the middle of Irvine Street. A street car was following Doyle, as he began to close the gap between himself and the two death-defying vehicles, one of which was now emitting sparks. The two motor meteors streaked forward on Irvine Street, with Doyle in hot pursuit, for five or six blocks when the Mercury suddenly swerved at a 15-degree angle toward the south side of the street and the Oldsmobile swerved at a 60-degree angle toward the north side of the street—and they crashed.

There was not the slightest intimation or inference in the testimony of any of the admitted eight eyewitnesses of the unhappy Chioda-Joseph encounter which gave the remotest support to Doyle's narrative. All the physical facts argued against it: the 90-mile-an-hour velocity over street car tracks, the sudden V-forming convergence, and the fact that despite the abrupt right turning of the Oldsmobile going at least 75 miles an hour, it did not upset. Doyle's account was, to say the least, in the words of the Bard, "wondrous strange."

Everyone in life has at some time or another listened to the story of a seemingly honest person which is so opposed to material realities, so contrary to con-

temporaneous observations by others in an equally advantageous position to note the truth, and so utterly unbuttressed by geography, physics, reason, or logic, that one can only conclude that the account is the product of an aberration, of a failure of the senses, or of a memory which records what is imagined rather than what is seen, heard or felt. It is not known whether Doyle's testimony falls into any of such categories, and this Court does not attempt to characterize it in any way, but it is clear that the jury was not sufficiently instructed with regard to it. The very able Trial Judge, in speaking of this feature of the case, says in his opinion awarding the new trial that: "No objection was made by counsel for the plaintiffs to the introduction of two separate unreconcilable defenses. Therefore, the trial judge was not called upon to make any ruling." But even without any objection by plaintiffs' counsel or request for specific instruction, it was incumbent on the judge's part to guide the jury in passing upon so astonishing a variation from the defendant's own account as to what occurred.

When Doyle was asked as to why he followed the dare-devil racing cars he said he "predicted there was going to be an accident at the rate they were traveling." Later, he denied he had predicted an accident: "If I could predict there would be an accident, I could make a million dollars."

Still later he said that after the cars came together he called the police and then "sat in the doorway and talked to the street car motorman." "How long did you sit there?" "We were there from approximately between 10:30 and eleven o'clock, and I didn't get away from there until around about 11:30 or twelve o'clock." "You just sat there?" "I smoked cigarettes and talked to the street car motorman." When asked if he "didn't go up to see if there was any assistance you could

render to whoever was in the car," he answered: "No, I didn't."

Did Doyle's story have verisimilitude? Although he said that at the time of the collision of the two cars, he was only 50 feet behind them, and was travelling at 70 miles an hour, he was still able to avoid hitting them because he stopped his car within 25 feet!

In explanation of his strange behavior of becoming a third car in a two-car race he said that "it is that human intuition to see what happens with guys going at that rate of speed." He explained further that this was the "fireman in your blood."

He also gave another explanation: "Q. And you say you saw two cars going by anywhere from 70 to 90 miles an hour and there was no other traffic. Why did you decide to catch up to them? A. That's a good question. I couldn't tell you. It is just the old desire." It seemed that "the old desire" was a continuing one with Doyle. Even on the day of the trial he had that "desire." He said: "I just saw cars going and everybody does it, they step on the gas and move out. *It happened to me coming here today.*" (Emphasis supplied.)

Was the desire real or imagined? Was Doyle's story one to be submitted to the jury without some special instruction? When he was asked how far the collided cars moved after the impact he replied: "I wouldn't know that. I wasn't out on the front end of this Merk."

He was then asked how far away his Plymouth station wagon was from the two cars after the collision, and this was his startling response: "I couldn't tell you how far in feet. If you tell me to use kilometers or kilovolts, I would answer you."

The cross-examining attorney asked that Doyle give his estimate in kilometers, and he replied: "I would say that that house that is next to the garage—"

A litigating party has the right to present any evidence he wishes, provided it is relevant and competent, but when testimony on its face challenges the most trusting credulousness and reaches into the shadowy regions beyond the periphery of paradox and fantasy, a duty devolves upon the trial judge to lift a lantern of guidance in the resulting tenebrous atmosphere of ambiguity, confusion, and bewilderment. .

After the verdicts in this case had been recorded, the attorney for the plaintiffs moved for a new trial. This motion was argued before three exceedingly able and veteran trial jurists: President Judge McNAUGHER and Judges KENNEDY and WEISS. They unanimously agreed that a new trial was justified and so ordered. The defendant appealed to the Superior Court which reversed the order of the Court of Common Pleas because, it said, the verdict of the jury was a "compromise verdict." The lower Court said nothing about a compromise verdict. It founded its order for a new trial on the specific statement that the verdicts were inadequate. In this respect, it followed the authority of this Court in *Schwartz v. Jaffe*, 324 Pa. 324, 327, where Chief Justice KEPHART, said: "The power to set aside a verdict on the ground of inadequacy may be exercised whenever it appears to the court below that the amount is patently insufficient; an appellate court will not interfere with its exercise of discretion in this matter unless a gross abuse appears."

In the case of *Yacabonis v. Gilvickas*, 376 Pa. 247, this Court affirmed an order awarding a new trial because of inadequacy of verdict, Justice ARNOLD writing: "As to the inadequacy of the verdicts there can be no question. Patsy Yock was rendered unconscious, sustained a cut on the right knee requiring seven stitches and a cut on the left knee requiring three stitches, and was hospitalized. . . The jury

awarded her nothing for disfigurement, or for pain and suffering, but did allow her father, Joseph Yock, $105 for her medical attention and hospital bill. The jury had no right to award her father the special damages of $105 and not award the injured party anything. Of necessity she suffered pain, as the above meager recital of the facts clearly shows."

In *Henry v. Bulah*, 177 Pa. Superior Ct. 399, 402, Judge GUNTHER, speaking for a unanimous Court, said: "The court below in its opinion, reviewed the evidence of injuries and concluded that the verdicts for minor plaintiffs were inadequate. The granting of a new trial for inadequacy of the verdicts is a matter for the sound discretion of the court below and will not be reversed except for a clear abuse of such discretion."

In its analysis of the evidence in the case at bar, the Superior Court failed to show, although it attempted to do so, that the Trial Court had abused its discretion in ordering a new trial. It said that there was a "strong doubt the preponderance of the evidence is with the plaintiffs". The record would not indicate to us that there is a "strong doubt" the preponderance of the evidence is with the plaintiffs. On the contrary, especially in view of the verdict of the jury, the evidence would demonstrate that the preponderance of the evidence was quite overwhelmingly with the plaintiffs.

The Superior Court was apparently impressed with Doyle's testimony and said that there was "no apparent reason for Doyle to fabricate or even color his testimony." But it is not only fabrication or coloration of testimony which may render it incredible or unacceptable. When a witness describes a distance of mere feet in terms of kilometers and kilovolts, and when he says that he drives over city streets in the middle of the

night at a speed of 90 miles an hour just because he is a fireman at heart, one could find plenty of reason to accept his story as something less reliable than the multiplication table.

The Superior Court says that the jury could have found Joseph negligent because "he deliberately blocked two lanes of a busy highway at night by permitting his car to stand sideways on the street." This suggests that Joseph had allowed his car to remain motionless on the street for hours. The evidence, of course, shows that it was in a stationary position only for a matter of seconds, or, at the most, a minute or two, as he prepared to park, allowing, for the sake of safety, a car coming from the west to pass by first.

The Superior Court also concluded that Joseph's car was not sufficiently illuminated. It conceded that his "lights were on," but that they were rendered indistinct because of the "street light in the vicinity." In other words, the greater the light which flooded over Joseph's car, the less chance there was of its being seen. This is a novel observation on visibility at night, or any other time.

The Superior Court does admit that "the defendant should have seen Joseph's car in time to stop, and the evidence as a whole establishes that he was guilty of negligence under either version," but that this "does not exonerate Joseph from negligence on his part." The Court suggests that Joseph could have avoided the accident by "going over the curb onto the sidewalk, facing his car in the same direction he drove up to his home, or he could have gone further down the street, turned around, and approached his home from the opposite direction in which case he would have been able to enter the driveway without stopping on the highway."

Of course, Joseph could have avoided all possibility of accident by not taking his car out that night at all. The criterion of accountability, however, in a negligence case is not what an injured person might have done to avoid mishap, but whether what he did under the circumstances is what a reasonably prudent person would have done. Considering the lateness of the hour and the comparative sparseness of traffic at that time, the unobstructed visibility to all passersby of his car, the short period of time required to complete the maneuver of taking his car to the point where *he* wanted to have it for the night, one cannot say as a matter of law that he was guilty of contributory negligence. The jury found him free of contributory negligence and, under the circumstances of the case, this finding is final.

Although the Superior Court says that Chioda was "guilty of negligence under either version," it also says that "the jury could have found Joseph guilty of negligence under either story." But to find Joseph guilty of negligence under the Doyle story, the jury would have had to find that possibly Joseph not only attempted suicide by suddenly swerving his car right angularly while travelling at some 70 miles per hour, but that he intended to kill his brother Richard, as well.

In support of its statement that the verdict in this case was a "compromise verdict", the Superior Court cited the case of *Carpenelli v. Scranton Bus Company,* 350 Pa. 184, where the plaintiff had moved for a new trial on the basis of an inadequate verdict. But that case differs monumentally from the one at bar because there, the Trial Court *refused* the motion for a new trial and this Court sustained the refusal. Here the Trial Court *granted* the new trial. And in that same *Carpenelli* case, this Court reiterated the rule:

"When a court grants a new trial on the ground of inadequacy of the verdict an appellate court, in the absence of a gross abuse of discretion, will not interfere."

It is to be noted further that in the *Carpenelli* case, Justice STERN (later Chief Justice) said: "In the number of witnesses, in their disinterestedness, in the clarity of their testimony as to the happening of the accident, in the plausibility of their version of the occurrence,—in all these factors the advantage was markedly on the side of defendant."

In the case at bar, the reverse is true, because the plausibility as to the version of the accident is markedly on the side of the plaintiff.

The Superior Court opinion also cited *Karcesky v. Laria,* and quoted from it: "The net result, as every trial judge knows, is that in a large majority of negligence cases where the evidence of negligence is not clear, or where the question of contributory negligence is not free from doubt, the jury brings in a compromise verdict."

But, again, it must be emphasized that there is nothing of that in the case at bar. If the jury had sympathized with Joseph and Richard because of their injuries but intellectually believed, under the Doyle version, that Chioda was free from fault, the jury would have to believe that Joseph perpetrated a wholly inexcusable and wholly wanton act of jeopardizing his brother's life and inflicting disfiguring injuries upon him. In that event, why would they award Joseph anything at all? And if the jury accepted the Doyle story and sympathized with Richard, why would they not return a verdict against Joseph in Richard's case against Joseph? And if, under the reasoning of the *Carpenelli* case, the jury rendered a compromise verdict favoring the plaintiffs because

they were guilty of contributory negligence, on what basis could they find Richard and his mother guilty of contributory negligence?

The order of the Superior Court is reversed and the order of the Court of Common Pleas awarding a new trial is re-instated.

Mr. Justice JONES concurs in the result.