## Duffy *v.* Peterson, Appellant.

534

Argued October 1, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*James J. Burns, Jr.,* with him *Dail E. Sloan,* for defendant, appellant.

*Kim Darragh,* with him *George Y. Meyer,* for defendant, appellant.

*George S. Goldstein,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, November 14, 1956:

The Alcoa Building, 31 stories high and cloaked in aluminum, is one of the several attractive skyscrapers which have risen in Pittsburgh during recent years in the architectural renaissance of that city. Among the army of workers who prepared this ultra-modern office building for occupancy was the plaintiff in the instant case, James W. Duffy, employed by the Western Electric Company, sub-contractor engaged in installing telephone equipment and all appurtenant accessories.

On the morning of June 5, 1952, while proceeding to a designated Terminal Room of his employer on the 14th floor of the building, James W. Duffy tripped over a cord swung across the corridor he was traversing, and fell heavily to the cement floor, sustaining serious injuries. He sued Fischbach & Moore Company, electrical sub-contractors, and later the Peterson Company,* carpenter sub-contractors, charging them respectively with negligence in the manner in which their employees conducted their work in and about the area which was the scene of his misfortune. The two suits were consolidated for trial, and the jury, sworn in the case, returned a verdict of $25,000 against both defendants. The lower Court reduced the verdict to $18,000, and both defendants appealed, urging judgment n.o.v.

A study of the record makes it abundantly clear that Duffy was employed at a job which called for cau-

---

* Emil Peterson, William E. Peterson and Miles Olsen, Partners, Trading and Doing Business as Peterson Company.

tion and care on the part of those whose own duties brought them into the orbit of his legitimate activities. Whether the defendants who were operating within this orbit did or did not discharge their obligations toward him was a question for the jury to decide. In a review of the record we are required to declare all inferences, where there is conflict in the testimony, in favor of the verdict winner, here the plaintiff. (*Ranck v. Sauder*, 327 Pa. 177.)

The corridor in which the plaintiff Duffy fell to his injury was a passageway some 8 feet wide and 100 feet long, running northwardly and southwardly, parallelling William Penn Way 14 floors below, and overlooking Strawberry Alley at the northern end and Sixth Avenue at the southern end. Throughout the length of the corridor, 4 or 5 feet of its width was taken up with piled-up lumber, pipe, brick, and plaster, plus the inevitable debris which follows the work of craftsmen as they turn raw materials into a neat building with shining corridors, immaculate rooms, elevator shafts, and stairways. Because of the accumulations indicated, the walking space in the corridor was narrowed to 3 or 4 feet, which situation imposed on all persons in the vicinity the obligation of keeping the path clear of obstructions.

At a point some 60 feet from the northern end of the corridor, two carpenters employed by the Peterson Company were, on the morning of June 5, 1952, engaged in the operation of power-saws at a table on the western side of the corridor. The overhead lighting, not being powerful enough to illuminate the immediate work before them, the carpenters pressed into service a portable electric light attached to the end of a ⅜ inch cord which stretched from an opening on the left side of the corridor, across the 3 to 4 feet-wide path-

way, to the table. As the cord entered into the corridor from the left, it sagged to a point 4 inches from the floor and then looped up to the table 4 feet high.

The Fischbach & Moore Company, under its contract with the general contractor, Geo. A. Fuller Company, had the responsibility and obligation of keeping the working premises lighted. With this object in view it strung an electric energy circuit line along the ceiling of the corridor with sockets at 10-feet intervals for light bulbs. However, with the exception of one light at the northern extremity of the corridor, the sockets attached to the wire were more ornamental than useful since they were empty of bulbs. Not only was the one solitary bulb at the northern end not capable of doing the work of ten, but it could not even reach the maximum brilliance of its 75-watt power because it had to struggle through glass which was encrusted with dust and dirt.

As the plaintiff Duffy entered into this tunneled semi-obscurity on the morning of the accident, he found himself following, at a pace or so, another worker who was also proceeding toward the southerly terminus of the corridor, but who, when 60 feet into the corridor, suddenly turned into a room at the right. An instant later the plaintiff struck the lurking cord serpentining across the passageway, lost balance, and struck the cement floor with such violence as to shatter the knee cap of his left leg.

It is admitted on the part of the defendant Peterson Company that its employees were negligent in pulling the ⅜ inch cord across the corridor, but Peterson contends that the plaintiff was guilty of contributory negligence, as a matter of law, in not having observed the obstacle which must have been within his range of vision. However, one of the major factual issues in the case was whether, in fact, Duffy, in the

exercise of reasonable care, knew of the presence of the extension cord. If Duffy was actually ignorant of its existence he cannot be held responsible for not seeing it. Although it is said that ignorance of the law is no excuse, the law does not hold anyone responsible for what is locked within the vaults of secrecy or hidden in the dark caverns of the unknown.

In support of the plaintiff's position that he was unaware of the cord's presence, he asserts that, firstly, the eyeless sockets above him left the floor below in near-darkness; secondly, that the slender black extension cord blended with and disappeared into the shadows caused by the neighboring table and other objects; and thirdly, the figure of the workman preceding him down the corridor shut off from him a more searching view of what lay ahead as he hurried to the beginning of his labors of the day. If these skeletonized arguments are clothed with the flesh of substantive evidence, there can be little doubt that the plaintiff exculpated himself from the charge of contributory negligence, and at the same time laid at the door of Fischbach & Moore the responsibility for the scanty illumination, which, allied with the negligence of the Peterson Company, brought Duffy to his knees and ensuing injuries.

The Fischbach & Moore Company stands on three different platforms in arguing for judgment n.o.v., namely, (1) it owed no duty to the plaintiff; (2) that the semi-darkness of the corridor was not the proximate cause of the accident; and (3) the plaintiff knew of the dim light in the corridor.

All individual sub-contractors engaged in a common enterprise owe to each other the duty of care required to business visitors. Business visitors are defined in the Restatement, Torts (Section 332, comment

a) as "those who come upon the land for a purpose which is connected with their own business which itself is directly or indirectly connected with any purpose, business or otherwise, for which the possessor uses the land." The Western Electric Company, employer of the plaintiff, was on the premises of the Alcoa Building furthering its work which was connected with the business purpose for which Fischbach & Moore and the Peterson Company were also there, namely, the building of the Alcoa skyscraper. The duty which Fischbach & Moore and the Peterson Company owed to the employees of the contractors Fuller Company, they owed equally as well to the employees of their fellow sub-contractors who, in turn, owed a similar duty to Fuller and others engaged in the same building operation.[*] Restatement, Torts, §384, provides: "One who on behalf of the possessor of land erects a structure or creates any other condition thereon is subject to the same liability . . . as though he were the possessor of the land, for bodily harm caused to others within and without the land, while the work is in his charge, by the dangerous character of the structure or other condition." Comment d under Section 384 states: "A possessor of land may put a number of persons severally in charge of the particular portions of the work of erecting a structure or creating any other condition upon the land. Again, a general contractor employed to do the whole of the work may, by the authority of his employer, sublet particular parts of the work to subcontractors. In such a case, the rule stated in this Section applies to subject the particular contractor or subcontractor to liability for only such harm as is done by the particular work entrusted to him."

[*] *Bitting v. Wolfe*, 368 Pa. 167.

Section 343 declares that a possessor of land is responsible for injuries suffered by business visitors if he "knows, or by the exercise of reasonable care could discover, the condition which, if known to him, he should realize as involving an unreasonable risk to them."

Comment d under Section 343 makes clear that: "A business visitor is entitled to expect that the possessor will take reasonable care to ascertain the actual conditions of the premises and, having discovered it, either to make it reasonably safe by repair or to give warning of the actual condition and the risk involved therein."

Did Fischbach & Moore, taking over in their assigned sphere of work the responsibility of the possessor toward business visitors, use reasonable care under the circumstances? Did they meet the obligations imposed by their contract with the general contractors to supply illumination for the workers? Every workman is entitled to a workshop devoid of perilous conditions that serious reflection, reasonable anticipation, and practicable scientific preparation can avoid. Did Fischbach & Moore use the care required to protect Duffy from the harm which they could reasonably anticipate? The jury found that they did not; and certainly one cannot quarrel with the jury's conclusion that one 75-watt bulb and nine blind sockets would not provide anyone with sufficient illumination (under the circumstances of this case) to see with precision the ground ahead unless he got down on his hands and knees and crawled forward with the concentration of a detective seeking footprints.

Nor is there any doubt that Fischbach & Moore had notice of the dim lighting which concealed the aggressive extension cord in ambush.

We hold that the record establishes that Fischbach & Moore, as well as Peterson, did owe a duty of reasonable care to Duffy.

The question of proximate cause of the accident was a factual one for the jury, which decided by its verdict that the enveloping gloom at the point of the mishap, plus the careless maneuvering of the carpenters' cord, caused Duffy's injuries. A reading of the transcript of testimony satisfies us that in reaching their conclusions in this respect, the jury did not trip over fact or law.

It was testified that the plaintiff's foreman, Nowark, passed through the corridor the same morning of the accident (prior to the plaintiff's mishap), and that he saw the extension cord. It was also testified that the workman who preceded Duffy through the passageway did not trip over the cord. From these two circumstances, it is urged in behalf of both defendants that Duffy should have seen the cord. It was not demonstrated that when Nowark negotiated the danger spot the conditions were precisely the same as those which obtained when Duffy appeared on the scene. Also, the fact that the man who preceded Duffy did not fall does not prove that the corridor was safe. Occasionally persons go over Niagara Falls without perishing. A number of possibilities can explain the other worker's safe passage. He may have stepped higher than Duffy, or the cord, since it was in the state of active use, might have dropped lower at the moment he passed over it. At any rate, there is no evidence that that employee saw the cord. And in any event the question of contributory negligence was strictly one for the jury, whose deliberations were more than adequately illuminated by the very capable charge of the Trial Judge.

Only one more matter in this well-tried case needs to be considered. The appellant Fischbach & Moore argues that there is a variance between the allegata and probata, asserting that in his complaint the plaintiff alleged that the primary charge of negligence against that corporation consisted in having negligently strung the extension cord and not in having inadequately illuminated the corridor. The learned Trial Court well disposed of this argument as follows: "However in that original suit one of the allegations of negligence was: 'In failing to illuminate the corridor so as to disclose the existence of the temporary light cord strung across the corridor.' This certainly was sufficient notice that inadequacy of illumination was one of the items of negligence chargeable to it. Then again in the complaint against Peterson Company which was filed later and when the plaintiff's counsel ascertained that the electric cord had been strung across the passageway by that defendant's employees it was clearly set forth that the plaintiff was claiming joint and concurrent negligence not only against Peterson Company but also Fischbach & Moore, Inc. There is therefore no merit to this reason for a new trial."

Judgment affirmed.