## Davanti, Appellant, v. Hummell.

Argued September 27, 1962. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*John N. Scales*, with him *John D. Lyons*, and *Scales and Shaw*, for appellants.

*Robert W. Smith, Jr.*, with him *Smith, Best and Horn*, for appellees.

OPINION BY MR. JUSTICE MUSMANNO, November 13, 1962:

Mrs. Dolores Davanti, 34 years of age, was a member of a husband and wife bowling team in Jeannette. On the evening of September 7, 1958, she entered, with her husband, the Bowl-A-Rena in that city to participate in a bowling match. She arrived at 8:45 o'clock, hung up her coat, got into her bowling shoes, took a seat at a bench in the rear of Alleys 9, 10, 11, and 12 and waited for the other bowlers to arrive. They all assembled by 9:20, and some time between 9:20 and 9:30 the game got under way.

Mrs. Davanti was the first bowler and she prepared to use Alley No. 10. She picked up a bowling ball and at a point about two feet before the runway began her maneuver to launch the ball. She ran forward on to the runway, her eyes on the foul line (which a bowler must not trespass) and on the duck pins at which she was aiming. When she reached her fifth running step, her left foot encountered a substance of some kind which held her for an instant and she sprawled forward on hands and knees, sustaining injuries. A mem-

ber of the league, a Jack Byrns, helped her to her feet and she now examined the floor to see what had caused her to tumble. She found a sticky and waxy substance about the shape and size of a silver dollar. She scraped her shoe over it, confirming that it was of an adhesive constituency. One of the members of the league informed the management as to what had happened and an attendant came at once to wipe up the substance with a piece of steel wool.

Mrs. Davanti and her husband brought an action of trespass against the owners of the Bowl-A-Rena. At the trial, the judge entered a compulsory nonsuit on the basis that even if the accident happened as described by Mrs. Davanti, there was no proof that the defendants had actual or constructive notice of the foreign substance on the floor.

Reading the evidence, as we are required to do in considering the lifting of a nonsuit, in the light most favorable to the plaintiffs, we must assume that the offending substance was on the bowling floor for a period of from 35 to 45 minutes. Is that enough time to establish constructive notice, for it is not claimed that the defendants had any actual notice of the "silver dollar" obstruction?

The length of time required to fasten constructive notice of a dangerous condition on the owner of premises open to the public fluctuates according to the nature of the establishment and the need for inspection. There could be a state of affairs when even five or ten minutes would be enough interval for notice and another situation where as long as five hours or five days would not be sufficient time. A situation involving the cooking of food in a kitchen, or the preparation of medicine in a pharmacy, for instance, could fall within the former category, and a defect in an unfrequently used road might come within the later category. (*Branch v. Phila. Trans. Co.*, 374 Pa. 60.)

The runway of a bowling alley is that flooring which precedes the actual alley and on which the bowler operates. For the purposes of the techniques involved in bowling, a runway must be smooth so that if the bowler slides on his feet, as it often happens in the process of launching the ball, he will not, because of the momentum of his body, lose balance, a very likely possibility, if the slightest impediment in the floor holds him fast, even only momentarily. Short of an actual projection rising from the floor, or an actual break in it, nothing perhaps could be more conducive to precipitating a bowler's fall than a sticky substance which would grip the bowler's pedal movement at the crucial moment of hurling the bowling missile.

Thus, there would be a duty on the part of a bowling alley owner to make certain that the runway is smooth and clear of obstruction just before a bowling game is to begin, as much as there would be a duty on the part of a swimming pool proprietor to make certain that a bar of soap is not resting on the diving board just before he opens the pool to the public.

Since the area of a runway is not large, it would not be an onerous burden to place on the bowling alley management to make an inspection before playing begins, especially when there is ample time to look over the floor for lurking defects. What would constitute ample time? There is no hard and fast rule in cases of this kind and no appellate court would set down an inflexible time schedule which would control in all cases of constructive notice. It would seem, however, that 35 to 45 minutes would be an adequate interval for an attendant, in a bowling alley, to examine the runways to make certain that they are free of objects which could injure the establishment's patrons. However, whether that time would be enough in any given set of circumstances is for a jury to decide according to all the facts. We would go so far only to say that

35 to 45 minutes cannot be excluded judicially as too little time for the bowling alley management to conduct a necessary inspection or examination, when an alley is not actually in use.

In support of its decision of nonsuit, the lower Court cited *Fagan v. Williamsport Lodge,* 361 Pa. 446, but in that case the alley in controversy had been in constant use for three hours prior to the accident there complained of. In addition, the "sticky" spot involved was not visible. The lower court in that case said, with the approval of this Court: " 'the spot complained of was not visible to any person, not even to the plaintiff or his friends, despite the fact that plaintiff's friends had been continuously bowling on the same alley since three o'clock in the afternoon . . . We do not think a prudent person similarly situated would deem it necessary to inspect an alley which during the period immediately preceding an accident was being continually used without the discovering of a defect.' "

Charging the owner of premises with constructive notice of something he cannot see would obviously be unfair and unjust, but there is no contention in the case at bar that the object which caused the plaintiff to fall was invisible. On the contrary, the evidence was that, after the accident, an employee of the defendant removed the offending item.

The whole issue in this case is whether the foreign article was on the runway long enough to visit the owner of the establishment with constructive notice. The Superior Court well said in *Bremer v. W. W. Smith, Inc.,* 126 Pa. Superior Ct. 408, 411: "What will amount to constructive notice of a defective or dangerous condition existing upon a defendant's premises, necessarily varies under the circumstances of each case. Some of the factors affecting the question, in addition to the time elapsing between the origin of the defect and the accident, are the size and physical condition

of the premises, the nature of the business conducted thereon, the number of persons using the premises and the frequency of such use, the nature of the defect and its location on the premises, its probable cause and *the opportunity which defendant, as a reasonably prudent person, had to remedy it.*" (Emphasis supplied.)

With this standard of proof to guide deliberations in a further trial, the order of the lower Court is reversed, with a venire facias de novo.

Mr. Justice COHEN dissents.

Mr. Justice KEIM took no part in the consideration or decision of this case.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

I dissent. Just exactly what kind of a substance it was that caused plaintiff-wife to fall is not clear, although it would appear to be a patent as distinguished from a latent defect. If plaintiff could not see the defect, which she claims existed and was right in front of her for 35 or 40 minutes, how could defendant have seen it? Does it not seem strange that every defendant *must* see what a plaintiff *could not see*?