450 A.2d 991

**Frank McDEVITT, Appellant,**

**v.**

**TERMINAL WAREHOUSE COMPANY and Scott Brothers, Division of Pennsylvania Truck Lines, Inc.**

**Frank McDEVITT, Appellant,**

**v.**

**TERMINAL WAREHOUSE CO.**

**v.**

**SCOTT BROTHERS DIV. OF PENNSYLVANIA TRUCK LINES, INC.**

Superior Court of Pennsylvania.

Argued Jan. 19, 1981.

Filed June 25, 1982.

Reargument Denied Oct. 12, 1982.

Petition for Allowance of Appeal Denied Oct. 29, 1982.

George J. O'Neill, Philadelphia, for appellant.

J. Paul Erwin, Jr., Philadelphia, for appellees.

Before HESTER, POPOVICH and DiSALLE, JJ.

POPOVICH, Judge:

This case involves cross-appeals in a trespass action brought by the appellant-Frank McDevitt (McDevitt) for injuries he sustained on the premises of appellee-Terminal Warehouse Co. (Terminal) while in the course of his employment for Scott Brothers, a trucking firm. A jury returned a verdict in favor of McDevitt and against the appellee and Scott Brothers in the amount of $200,000.00. At post-trial, the court en banc granted appellee's and Scott Brothers' motion for a new trial, but denied their motion for judgment

*non obstante veredicto.* An appeal was filed by the appellant [1] from the order granting a new trial, while the appellee questions the denial of the judgment n.o.v.[2] We affirm in part and reverse in part.

On appeal from the refusal of the trial court to enter judgment for the defendant-appellee *non obstante veredicto,* the sole duty of the appellate court is to decide whether there was sufficient competent evidence to sustain the verdict, granting the verdict winner, the appellant here, the benefit of every favorable inference reasonably to be drawn from the evidence. *Mike v. Borough of Aliquippa,* 279 Pa.Super. 382, 421 A.2d 251 (1980). All unfavorable testimony and inferences must be rejected. *Smith v. Kravitz,* 173 Pa.Super. 11, 93 A.2d 889 (1953). As to reviewing on appeal the grant or refusal of a new trial, we will not reverse the lower court's action " 'absent an abuse of discretion or error of law which controlled the outcome of the case.' " *Allison v. Snelling & Snelling, Inc.,* 425 Pa. 519, 521, 229 A.2d 861, 862 (1967); *Gougher v. Hansler,* 388 Pa. 160, 130 A.2d 150 (1957); *Lambert v. Durallium Products Corp.,* 364 Pa. 284, 72 A.2d 66 (1950). In compliance with such

1. Frank McDevitt died on October 31, 1978 and Ruth McDevitt, his wife and executrix of his estate, was substituted as plaintiff-appellant.

2. On the question of jurisdiction, we are vested with authority to review the appellant's appeal, inasmuch as it concerns "[a]n order in a civil action or proceeding awarding a new trial," (Pa.R.App.P. 311(a)(5)); as for the appellee, the denial of its motion for judgment n.o.v., despite the grant of its motion for a new trial, is appealable. *See* Act of April 9, 1925, P.L. 221, 12 P.S. § 682, *repealed* by the Act of April 28, 1978, P.L. 202, No. 53, § 2(a)[891], effective June 27, 1980; *Corabi v. Curtis Publishing Co.,* 441 Pa. 432, 273 A.2d 899 (1971). Also, we observe that appellee's request for binding instructions was denied and it took exception to same. (N.T. 518–519); (*See* "Defendant's Motion For Judgment Notwithstanding The Verdict And, In The Alternative, Defendant's Motion For A New Trial," Point # 5, at p. 2)

It is to be noted that Scott Brothers did not take an appeal from the court *en banc's* order denying its motion for a judgment n.o.v. (*See* letter filed with this Court by Scott Brothers' attorney, who also represents Terminal, dated January 7, 1981, that he would not be filing a Brief in the instant case).

standards, the following facts, as warranted by the evidence and established by the verdict, appear.

Terminal operated a warehouse complex in the City of Philadelphia, located on 2nd Street and Erie Avenue. A portion of that complex, namely a parking area, was subleased to Scott Brothers for their tractors and trailers. Interestingly enough, the lease agreement made no mention as to which party would be responsible for the maintenance of the premises. A review of the record indicates, however, it was the common and accepted practice that complaints lodged by Scott Brothers' employees with their supervisors, regarding the condition of the parking facilities, would be forwarded to the personnel at Terminal, and they, in turn, would make the needed repairs. It is to be noted that when this maintenance work was performed, Terminal's employees were always used.

With such facts as a backdrop, we recount the circumstances precipitating the instant litigation. McDevitt, an employee for Scott Brothers for about sixteen years, had been assigned to the 2nd Street and Erie Avenue warehouse for some "five, six years" prior to the date of his accident on November 1, 1966. On the date just mentioned, at approximately 8:00 p. m., McDevitt, in his capacity as "helper," was assisting a Scott Brothers' driver (Larry Ballard) park his tractor-trailer between two other "rigs." Since there was no lighting in the area, McDevitt "was looking at the ... skyline." (N.T. 307) He did this because he "could tell by the silhouette of the outline of the trailer just where it was going, maneuvering, to go back in[to the parking slot]." (N.T. 306 & 307) With appellant standing along the passenger side of the tractor-trailer, the driver angled the trailer portion of the vehicle into position. The driver then stopped and pulled forward in order to align the trailer with the tractor before attempting to back the entire "rig" into the parking space. During this pause, appellant situated himself approximately 12 feet from the front bumper of the tractor, i.e., between the dolly wheels and the tractor wheels, facing the rear of the vehicle. Additionally, because of the

poor lighting available (which precluded McDevitt from seeing the ground in front of him), appellant placed his right hand on the side of the trailer to guide and to steady himself as he walked with the moving truck—this made him feel "a little safer with it there" and allowed him to sense when he was getting too close to the trailer. (N.T. 346 & 358) Thereafter, the tractor-trailer traveled a distance of some 15 feet before the appellant "stepped in a hole with [his] right foot"—the hole was deep enough to encompass his entire foot. (N.T. 312 & 324) The appellant then lost his balance and fell down on his right knee, and that is when he felt his right foot get caught under the back rear wheel of the tractor. McDevitt screamed hysterically, "Stop! Stop! Stop!" Before the driver heard him so as to react and move the vehicle forward, the victim's right foot was crushed, causing permanent injury.

Appellee-Terminal contends that the evidence in this case "compel[s] the conclusion that judgment notwithstanding the verdict should have been granted on the ground that plaintiff[-appellant] was negligent and/or assumed the risk and that, in any event, the evidence was insufficient to take the case to the jury on the issue of Terminal Warehouse's negligence." [3] (Appellee's Brief at 6) Counsel for McDevitt, on the other hand, argues that his client "was acting under the 'compelling necessities' of his employment and violated no duty owing to himself or others." (Appellant's Reply Brief at 3)

■■■ The legal principles applicable to the present case were recently collected and set forth in *McNally v. Liebowitz*, 274 Pa.Super. 386, 389, 418 A.2d 460, 461 (1980), reversed on other grounds, 498 Pa. 163, 445 A.2d 716 (1982), wherein we stated:

"Although it is true that these 'darkness' cases necessarily depend largely on individual facts, *Dively v. Penn-Pittsburgh Corp.*, 332 Pa. 65, 2 A.2d 831 (1938), this area of the

**3.** Comparative negligence principles are not applicable in this case since the cause of action arose before September 7, 1976. *Costa v. Lair*, 241 Pa.Super. 517, 363 A.2d 1313 (1976).

law has been well developed and some general rules have evolved. Thus, in the absence of compelling necessity, it is generally held ' "that one who follows an unfamiliar course in the dark or steps into *darkened and unfamiliar* space, relying upon his sense of touch instead of obtaining and using adequate lighting facilities, and sustains personal injuries, is guilty of contributory negligence as a matter of law." ' *Just v. Sons of Italy Hall,* 240 Pa.Super. 416, 422, 368 A.2d 308, 312 (1976) (emphasis in original), *quoting Barth v. Klinck,* 360 Pa. 616, 618, 62 A.2d 841, 842 (1949). '[D]arkness is, in itself, a warning to proceed either with extreme caution or not at all.' *Barth v. Klinck, supra,* 360 Pa. at 618, 62 A.2d at 842; *Mogren v. Gadonas,* 358 Pa. 507, 511, 58 A.2d 150, 152 (1948). The controlling factors in determining the question whether one was contributorily negligent in proceeding in the darkness are the degree of darkness and the justification for the injured person's presence in the place of danger. *Dively v. Penn-Pittsburgh Corp., supra; Just v. Sons of Italy Hall, supra.*

The degree of darkness is important in determining if appellant had reason to apprehend the danger. If the area was not totally dark, she may have been reasonably justified in assuming that with appropriate care she could reach the end destination without mishap. In all cases one must use the senses that are available, *Bartek v. Grossman,* 356 Pa. 522, 52 A.2d 209 (1947), and it is only when a plaintiff uses his sense of sight carefully and reasonably believes that he can 'see his way', but was then deceived by shadows, that the question of his negligence will be for the jury. *McKown v. Demmler Properties, Inc.,* 419 Pa. 475, 214 A.2d 626 (1965); *Carns v. Noel,* 364 Pa. 77, 70 A.2d 619 (1950); *Falen v. Monessen Amusement Co.,* 363 Pa. 168, 69 A.2d 65 (1949)."

Further, this Court held in *Devine v. Hollander,* 192 Pa.Super. 642, 648, 161 A.2d 911, 914–915 (1960) that " . . . a person may be declared guilty of contributory negligence when he wanders around in darkness in a place where he has

no reason to be, such a declaration will not be made *if he has a fairly compelling reason to be there and the place is not utterly devoid of light.*" (Emphasis added) (Citations omitted)

Applying the governing rules outlined *supra,* it is clear that the appellant had a "fairly compelling reason" for walking on the parking grounds since he was in the process of performing his job. *See Scurco v. Kart,* 377 Pa. 435, 105 A.2d 170 (1954) (plaintiff had a "fairly compelling reason" for walking through the hallway since she was bound for her place of employment); *see also Draper v. Airco, Inc.,* 580 F.2d 91, 102–103 & n. 12 (3rd Cir. 1978); Restatement (Second) of Torts, § 343A, Comment *f,* Illustration No. 5. As for a determination as to the degree of darkness, necessarily intertwined therewith is an evaluation of the reasonableness of appellant's actions under the circumstances. *Krusinski v. Chioda,* 394 Pa. 90, 103, 145 A.2d 681, 687 (1958) ("The criterion of accountability . . . in a negligence case is not what an injured person might have done to avoid mishap, but whether what he did under the circumstances is what a reasonably prudent person would have done."); *Jewell v. Beckstine,* 255 Pa.Super. 238, 386 A.2d 597 (1978).

 In the case *sub judice,* we have an employee-employer situation; as such:

"In determining the standard of conduct of one who is injured in the performance of his employment, the working conditions and all of the circumstances incident thereto, including his obligation to do his job, must be considered: *Stringert v. Lastik Products Co., Inc.,* 397 Pa. 503, 155 A.2d 625 (1959). If in performing his employment, a workman conforms to the ordinary usage thereof, this is evidence of the exercise of due care and indicates lack of careless conduct: *Mutter v. Slaymaker,* [404 Pa. 369, 171 A.2d 779 (1961)]. As stated in *Van Zandt v. Phila. B. & W. R. R. Co.,* 248 Pa. 276, at 281, 93 A. 1010, at 1011: 'What is required of the workman is that he exercise care for his safety according to the circumstances. He knows he is occupying a place of great danger, and his

care must be commensurate with that danger. He is equally cognizant of the fact that he must perform faithfully the services required of him. Both obligations are resting upon him, and each must be met with a due regard to the other.'" *Gregorius v. Safeway Steel Scaffolds Co.,* 409 Pa. 578, 584, 187 A.2d 646, 649 (1963).

Initially, we shall discuss the issue of whether there was sufficient light for appellant to see his way.

On direct examination, appellant responded in the negative when asked if there was any illumination from the 200-watt bulb affixed atop an 8-foot pole situated next to the gas pump, which was 6 to 8 feet at its closest point from the front bumper of the tractor-trailer when it was being parked. In fact, he stated he "could hardly tell ... when [he] ever seen [sic] it[ ]" operating. (N.T. 324)

Additionally, a number of appellant's co-workers testified to the condition of the lot. For example: Joseph Kleschick, who was working at the loading dock about 100 feet from where the appellant was situated, corroborated appellant's accounting that the light near the gas pump was not working. As to the lighting provided the parking area in general, the witness stated there was no other illumination, except for the glare coming from the lights at the loading area. Next, Joseph Andrew Mooney could state no more than that there was a light bulb at the gas pump, "but whether or not it was on is another story. One day it would be on. The next day it wouldn't be." (N.T. 124) Finally, Herman A. Tinsely, Scott Brothers' dispatcher, opined that the lighting situation on the night of the accident was "[j]ust normal ... as far as [he] was concerned[;]" in other words, "poor." (N.T. 175)

Neither side takes serious issue with the contention that the surface of the parking lot was in disrepair (e.g., it had bumps, gullies, hills, dips and holes) for some time prior to the incident, and that appellant was aware of such condition. As a result, the real question to be resolved is in regard to appellant's behavior in light of the circumstances confronting him. As Dean Prosser has aptly stated on this subject:

"So far as contributory negligence itself is concerned . . . the reasonableness of the plaintiff's conduct is to be determined by balancing the risk against the value which the law attaches to the advantages which he is seeking." W. Prosser, Handbook of the Law of Torts (4th Ed. 1971) pp. 424–425; *see also McKenzie v. Cost Bros., Inc.,* 487 Pa. 303, 311, 409 A.2d 362, 366 (1979) (" 'The standard of due care is such care as a prudent person would exercise under the circumstances of the particular case, and conformity to customary or usual conduct or methods cannot amount to more than a circumstance to be considered together with other circumstances of the case in determining whether due care has been exercised[.]' "). A review of appellant's testimony is necessary to ascertain the "reasonableness" of his actions.

We start with appellant's testimony on cross-examination, wherein he was asked:

"Q When you were doing that [—i.e., looking at the silhouette of the trailer against the sky], could you see the trailer?

A No. I just had my hand on it just to make sure I felt a little safer with it on there.

Q Was that because you couldn't see it, it was so dark?

A It was very dark, but I—I kept it there as a rule just to make sure I felt a little more safe with my hand there."

(N.T. 346)

Still pursuing the same subject, i.e., illumination at the situs of the accident and its affect on McDevitt's ability to direct Larry Ballard into a parking space, counsel for Terminal inquired:

"Q What were you looking at?

A Only the sky up and on the top. The light from the sky on the edge of the trailer.

Q Even though this was a very, very dark night, you could see the sky?

A *It wasn't that dark. It wasn't too dark of a night, sir.*

Q Pardon?

A *It wasn't too dark of a night.*

Q Well, didn't you just tell us you couldn't see the ground in front of you?

A I couldn't see the ground, but, I mean, at the sky—*to look at the sky, it wasn't that—too dark.*

Q Were you trying to look at where you were walking?

A You couldn't see anything practically in front of you.

Q Were you trying to look in front of you? Did you glance down to see what was in front of you?

A *You tried the best you could, I guess.*

(Emphasis added) (N.T. 356–357)

Additionally, appellant answered, in response to defense counsel's query as to the lighting conditions in general:

"A *Well, it was very dark, except for some light that we were getting from the sky.*

Q Was it cloudy, do you recall?

A It was an overcast night, I remember, and it wasn't too cloudy. No. It was—it was an overcast night, I guess you would call it.

Q Would you describe the conditions generally as very, very dark?

A *Pretty dark.*

Q Pardon?

A *Very dark. That's all I can tell you.*

(Emphasis added) (N.T. 345–346)

In deciding whether the aforesaid is sufficient to establish appellant's contributory negligence as a matter of law, we find that what was stated in *Duffy v. Peterson,* 386 Pa. 533, 126 A.2d 413 (1956) to be apposite to the case at bar. In *Duffy,* the complaining party was employed by a sub-contractor (Western Electric Co.) to install phones in an office building under construction. Duffy, in the course of his duties, tripped over a cord swung across the corridor he was traversing and fell, sustaining serious injuries. He sued Fischbach & Moore Co., electrical sub-contractors, and later

the Peterson Co., carpenter sub-contractors, charging them, respectively, with negligence in the manner in which their employees conducted their work in and about the area which was the scene of his misfortune.

The Peterson Co. contended that Duffy was guilty of contributory negligence, as a matter of law, in not having observed the obstacle. However, one of the major factual issues in the case was whether, in fact, Duffy, in the exercise of reasonable care, knew of the presence of the extension cord. As a result, if Duffy was actually ignorant of its existence he could not be held responsible for not seeing it.[4] In ruling on this question, Justice MUSMANNO, in his usual, piquantly expressive language, said:

"In support of the plaintiff's position that he was unaware of the cord's presence, he asserts that, firstly, the eyeless sockets above him left the floor below in near-darkness; secondly, that the slender black extension cord blended with and disappeared into the shadows caused by the neighboring table and other objects; ....

If these skeletonized arguments are clothed with the flesh of substantive evidence, there can be little doubt that the plaintiff exculpated himself from the charge of contributory negligence, and at the same time laid at the door of Fischbach & Moore the responsibility for the scanty illumination, which, allied with the negligence of the Peterson Company, brought Duffy to his knees and ensuing injuries." *Id.*, 386 Pa. at 538, 126 A.2d at 415.

Furthermore, in deciding if Fischbach & Moore Co. met its obligation to supply illumination for the workers, the Court held:

"Every workman is entitled to a workshop devoid of perilous conditions that serious reflection, reasonable anticipation, and practicable scientific preparation can avoid. Did Fischbach & Moore use the care required to protect

4. In the case at bar, appellant testified, on cross-examination, that he never saw the hole he stepped into, either before, during or after his fall. (N.T. 362) The reason he did not observe the hole was because of the insufficient lighting on the lot.

Duffy from the harm which they could reasonably anticipate? The jury found that they did not; and certainly *one cannot quarrel with the jury's conclusion that one 75-watt bulb and nine blind sockets would not provide anyone with sufficient illumination (under the circumstances of this case) to see with precision the ground ahead unless he got down on his hands and knees and crawled forward with the concentration of a detective seeking footprints."* (Emphasis added) *Id.,* 386 Pa. at 540, 126 A.2d 416.

■ Preliminarily, we need to address Terminal's argument that appellant failed to prove the breach of any duty owed by it to maintain the parking area. Albeit at trial no one disputed the fact that the contract between Terminal and Scott Brothers was silent on the subject of maintenance of the leased premises, the record is replete with evidence that Terminal performed needed maintenance for years for the benefit of Scott Brothers' employees. For example, testimony disclosed that none of the employees for Scott Brothers was aware of the location of the switch to operate the light at the gas pump—some stated they were told by management that Terminal took care of such matters. Testimony by a witness who was employed in a supervisory capacity by Scott Brothers disclosed that it was his practice to notify Terminal's agent when he received a complaint from one of his employees that the parking area was in need of repair. Additionally, the witness stated that when maintenance work was done on the premises it was performed by Terminal's employees.[5] Consequently, "while there was no express provision to that effect in the lease, there arose a necessary implication ... that sufficient light was to be furnished by [Terminal] to enable the premises to be used for the purpose leased, namely," parking trucks, *Dively v.*

5. Terminal neither offered evidence nor produced witnesses to contradict this evidence. It is interesting to note that Terminal did not completely surrender control and possession of the property to the lessees (Scott Brothers). It retained upon the premises a warehouse superintendent. As to the liability of the possessor of land to a lessee, where the lessor retains in his control any part of leased premises, *see* Restatement (Second) of Torts, §§ 360, 361.

*Penn-Pittsburgh Corp.,* 332 Pa. 65, 68, 2 A.2d 831, 833 (1938), which included the safe performance of such task by the lessee's employees. *See Duffy v. Peterson, supra.*

Given the facts instantly, while there does not appear to be any clear authority directly on this point, we are of the opinion that, in circumstances such as those presented by this case, regardless of the absence of a contract on the subject, Terminal, having undertaken to maintain the parking area in good repair, was under a duty to keep it reasonably safe for use by the employees of Scott Brothers. Thus, the question of whether or not appellee breached this duty in the case at bar was properly submitted to the jury for determination. *Pro v. Pennsylvania Railroad Co.,* 390 Pa. 437, 443, 135 A.2d 920, 923 (1957).

On the issue of contributory negligence, the facts established that there was a "fairly compelling reason" for appellant's presence in the parking area, i.e., the performance of his job. As to the second prong of such issue, which requires a determination of the degree of darkness at the site of the injury, *see McNally v. Liebowitz, supra,* while appellant described the parking area as "very dark" and "pretty dark" it would seem from other portions of his testimony, as well as that of other witnesses, that this was somewhat exaggerated, especially as to the nearby docking area, which must have emitted some measure of light. " 'Ordinarily where the testimony of a plaintiff, or of his witnesses, in a negligence case, is so contradictory or inconsistent that in one aspect it shows contributory negligence and in the other does not, it is for the jury to reconcile the conflicting statements and determine which shall prevail. The reason for the rule is that a plaintiff does not have the burden of disproving contributory negligence.' " *Gardner v. Kline,* 137 Pa.Super. 505, 508, 9 A.2d 487, 488–489 (1939); *Heimbach v. Peltz,* 384 Pa. 308, 315, 121 A.2d 114, 118 (1956) ("The plaintiff is not called upon to establish, as he produces the chain of evidence which binds the defendant in trespass, that in each link of that chain there is no alloy of contributory negligence .... [P]laintiff ' "is under no obligation to

prove the performance of any particular act by way of precaution against injury." ' "); *Stevenson v. Pennsylvania Sports & Enterprises, Inc.,* 372 Pa. 157, 93 A.2d 236 (1952).

We cannot ignore the appellant's testimony that, inasmuch as Scott failed to provide its employees with hand-held flash lights, he "tried the best [he] could" to complete the job assigned to him. That is, he felt his way cautiously and tried to assure his footing by placing his right hand on the side of the trailer. *See Bailey v. Alexander Realty Co.,* 342 Pa. 362, 367, 20 A.2d 754, 756 (1941) (" 'When one is moving in the dark, he must proceed with the greatest caution and literally "feel his way around." ' The instinct of self-preservation impels a man of ordinary prudence to avoid by the vigilant use of all of his faculties, a danger that should obviously be apprehended."); *accord Beck v. Stanley Co. of America,* 355 Pa. 608, 622, 50 A.2d 306, 313 (1947); *Just v. Son's of Italy Hall,* 240 Pa.Super. 416, 428 n. 6, 368 A.2d 308, 315 n. 6 (1976); *Luther v. Kline,* 145 Pa.Super. 188, 191, 21 A.2d 138, 140 (1941). Therefore, this case is not similar to those which deny recovery where the claimant is negligent in the manner in which he proceeds through an unlighted or dimly lit area. *See Polm v. Hession,* 363 P. 494, 70 A.2d 311 (1950). Thus, whether the appellant "should have done more . . . was for the jury to say[.]" *Stringert v. Lastik Products Co.,* 397 Pa. 503, 508, 155 A.2d 625, 627 (1959).

■■■■■ Applying the legal principles summarized above to the facts of this case, keeping in mind that "[i]n passing on questions of negligence, courts and juries must consider the realities of the situation[,]" *Mogren v. Gadonas,* 358 Pa. 507, 152, 58 A.2d 150, 512 (1948), we believe that reasonable minds could well have differed as to whether the appellant unreasonably placed himself in a situation known to him to be dangerous.[6] *See Smith v. Bell Telephone Co. of Pa.,* 397

6. Actual or constructive notice of a defect is a prerequisite to holding a possessor of land liable for bodily injury sustained by a business invitee (which no one disputes that appellant was) because of said defect. Restatement (Second) of Torts, § 343. We conclude that the factual situation under consideration is comparable to cases wherein the nature and location of the defect, considering all of the circum-

Pa. 134, 138–139, 153 A.2d 477, 479 (1959). We cannot hold, therefore, that appellant was contributorily negligent as a matter of law. The motion for judgment n.o.v. on this ground was properly denied. *See McNally v. Liebowitz*, 498 Pa. 163, 445 A.2d 716 (1982). As for appellee's assumption of risk argument, we find that the jury in the present case could reasonably find that even if appellant assumed the risk of walking in a dimly lit area, he did not assume the risk that he would step in a hole and be struck by the tractor-trailer. *See Fahringer v. Rinehimer*, 283 Pa.Super. 93, 423 A.2d 731 (1980).

■ We now turn our attention to the other claim, raised by the appellant on the cross-appeal, that the court *en banc* erred in granting appellee a new trial on the basis that the "trial court abused its discretion by prohibiting Terminal's counsel from cross-examining plaintiff[-McDevitt] as to certain written statements that he had given before the commencement of trial." (Lower Court Opinion at 8) As stated previously, in order for this Court to conclude that the action of the court *en banc* was error, we must find that the grant of a new trial either constituted an abuse of discretion or error of law. *Allison v. Snelling & Snelling, Inc., supra.*

An understanding of the circumstances prompting the alleged error is necessary as a prelude to an appreciation of the ultimate ruling made by this Court.

At trial, but prior to the taking of testimony, counsel for Terminal presented the court with the subpoena *duces tecum* served upon Continental National American Group (CNA), the compensation carrier for the additional defendant, Scott Brothers. CNA did not comply with the subpoena, which sought, *inter alia,* "the production of statements made by McDevitt," on the basis that: 1) the file constituted "investigative material" prepared in anticipation of litiga-

stances (*see Bremer v. W. W. Smith, Inc.,* 126 Pa.Super. 408, 191 A. 395 (1937)), justified a finding by the jury that it, i.e., the insufficient or nonexistent lighting, had existed for a sufficient length of time to amount to constructive notice. *See Stais v. Sears, Roebuck & Co.,* 174 Pa.Super. 498, 102 A.2d 204 (1954); *see also Davanti v. Hummell,* 409 Pa. 28, 185 A.2d 554 (1962).

tion; and 2) the file was "really the written summary of the attorney-client relationship and, as a result, [was] privileged[.]" (N.T. 6, 9 & 11) Appellant's counsel also objected, characterizing appellee's tactics as "discovery" in nature, and, thus, should have been dealt with pre-trial. Counsel for appellee disputed the equating of his action with "discovery." Rather, counsel argued that he wanted to review the file to determine what, if any, value the documents might have on his ability to impeach the appellant. The court agreed with the appellee that the documents be produced. The following day, at an *in camera* hearing, the file was produced and the court ruled that counsel for Terminal could inspect the documents therein, but reserved its decision on whether the appellee could use the documents for impeachment purposes. Exceptions were duly noted on behalf of the appellant and Scott Brothers. After reviewing the documents in question, appellee requested the use of Exhibits DT–3 through DT–11 (which contained statements attributed to the appellant concerning the accident) for cross-examination purposes. The trial court denied the request on the grounds that the information was: 1) secured in anticipation of litigation; 2) the work product of the insurer of Scott Brothers; and 3) unavailable under Pa.R. Civ.P. 4011(d), since the information in the documents was not limited to the identity or whereabouts of witnesses.[7]

After the ruling, Walter R. Druce, the CNA agent in charge of investigating the accident, gave the following detailed accounting of the substance of the Exhibits, i.e.:

7. Under the 1978 amendments, subdivision (d) of Rule 4011 was rescinded and eliminated. This subdivision precluded the discovery of information or other things made or secured by any person or party in anticipation of litigation or in preparation for trial, other than information as to the identity or whereabouts of witnesses. The discovery of trial preparation material is now allowable in accordance with Pa.R.Civ.P. 4003.3 through 4003.5. *See* 10 Goodrich-Amram 2d, § 4011(d):1. We need not rule on any of the trial court's reasons for excluding the information sought from the appellee, inasmuch as we find grounds other than those asserted by the trial court to uphold the denial of a motion for a new trial. *See Sones v. Aetna Casualty and Surety Co.,* 270 Pa.Super. 330, 411 A.2d 552 (1979).

1) DT–3 was a signed statement by the appellant, dated December 8, 1966. The two-page handwritten statement, which recounted the facts of the accident as told to Druce by appellant, read in part: "The tire caught the heel of my shoe and trapped my foot. I could not pull my foot loose." (N.T. 212)

2) DT–9 was an agreement for compensation for disability for permanent injury, dated December 20, 1966, signed by appellant and described the accident as follows: "Truck ran over right foot, causing comminuted fracture right cuboid." (N.T. 215)

3) DT–10A & B was an industrial accident report (one was a copy of the other) dated November 8, 1966 and was not signed by the appellant, which was forwarded to CNA by the employer, Scott Brothers. Section 27, captioned "how the accident happened," read in pertinent part: "—tractor's right rear wheel caught my right heel under it and started crushing—[.]" (N.T. 218)

4) DT–11 was a standard form for surgeon's report, sent out by CNA to doctors who were giving medical treatment to an injured claimant. Dr. Donald H. Greene, the physician treating appellant, completed and returned the report to CNA—it was dated February 21, 1967. Under the section identified as "The Accident," at No. 5 (captioned "State in patient's own words where and how accident occurred: ") it read: "Patient was working for Scott Brothers on 11-1-66 when a tractor-trailer caught his right foot between the tire and the ground." (N.T. 220)

Moreover, on cross-examination, appellee asked appellant if he might have informed any hospital personnel or Dr. Greene, his attending physician, how the accident happened. Appellant, somewhat equivocal, stated he "might have mentioned the fact that [his] foot had been run over by a tractor trailer." (N.T. 348) However, he did not recall telling Dr. Greene anything. Appellant went on to answer in the affirmative, when asked by counsel whether "one of the

wheels of the tractor ran over [his] foot." (N.T. 351) Also, when queried as to whether his foot slid to the right, appellant responded, "It didn't slide under the wheel. It slid between the wheel. Between the tractor wheel and, say, the dolly wheel." (N.T. 359) In another segment of the examination, appellant remarked that he "stepped in a hole." (N.T. 362) Given the conflicting testimony, counsel for Terminal asked, "Well, did your foot slide to the right or didn't it?" To which the appellant answered, "It could have slid to the right, yes, sir, too, but I remember I staggered into—into the trailer." (N.T. 363) Further, as expressed by the trial judge in his dissenting opinion to the court *en banc's* grant of a new trial: [8]

"In his cross-examination at trial of Dr. Greene, counsel for Terminal relied upon the following hospital records, none of which relate the accident in question to [appellant's] becoming entangled in a hole or to the dimly lit parking lot of Terminal:

(a) Exhibit DT–19B—Frankford Hospital Accident Ward Report—Patient's Statement—'Patient states truck backed over rt foot';

(b) DT–19C—Admission Form—Remarks 'Truck Ran Over Rt Foot';

(c) DT–19D—History taken by an intern and countersigned by Dr. Greene—'Pt. is a 53 yr. old male whose right foot was run over by a tractor';

(d) DT–19F—Orthopedic note written by Dr. Greene on 11/1/66—'53 yr old white male had his rt foot run over by a tractor trailer while working for Scott Brothers Trucking Company today suffering injury to rt Foot'.

Thus, counsel for Terminal was enabled to introduce at trial in his cross-examination (as well as in his summation) alleged prior inconsistent statements by [appellant] wherein neither the holes in the parking lot nor the poor illumination are mentioned. This was essentially the iden-

8. The trial judge (Sporkin, J.) was a member of the court *en banc* (consisting of Judges Greenburg and Cavanaugh) which ruled on the post-trial motions.

tical information which defense counsel sought to elicit via Exhibits DT–3, 9, 10a and b, and 11, . . . . Notwithstanding the fact that defense counsel was able to attack [appellant's] credibility in cross-examination and in argument by means of said hospital records, the jury was obviously not impressed with this evidence and found for [appellant]." (Sporkin, J., Dissenting Opinion at 15–16) We are in accord with the sentiments expressed in the aforecited Opinion, and find in support thereof the case of *Eldridge v. Melcher,* 226 Pa.Super. 381, 313 A.2d 750 (1973).

In *Eldridge,* the wife-appellee was in a collision in August of 1963, which caused her to suffer retrograde amnesia and left her two children fatally injured. Appellee instituted suit against the driver of the other vehicle involved in the accident in September of 1964. At a deposition taken in January of 1965, the appellee testified that her memory was "blank." At a pretrial conference in December of 1969, appellee's counsel stated that his client could not remember the facts surrounding the accident. At the time of trial, the only direct evidence concerning the accident was provided by the appellee. There were no eyewitnesses to the accident.

While on the stand, appellee recounted that as she rounded a curve a truck, traveling in the opposite direction, crossed over into her lane and struck her vehicle. On cross-examination, appellee testified that she told her attorney that she started to remember the circumstances surrounding the accident "Around '68." In turn, defense counsel offered the testimony of a Dr. Robinson, a psychiatric specialist, who examined the appellee four days prior to trial and elicited from her that: "She did not remember the accident happening . . . ." In rebuttal, appellee presented her own psychiatrist who testified that the amnesia suffered by her "could dissipate over a period of time."

At the conclusion of defendant-appellant's case, he requested that the court permit him " 'to offer into evidence . . . a statement by the [c]ourt to the effect that the pre-trial order of December 1969 reveal[ed] that the plaintiff[-appellee] did not have a recollection as to the circum-

stances of the accident.'" *Id.*, 226 Pa.Superior Ct. at 385, 313 A.2d at 753. The trial judge denied the offer of proof and the jury returned a verdict in favor of the appellee. On appeal, we found that no error was committed by the trial court in denying defense counsel's offer of proof. In so doing, we stated:

> "It is the trial court's function to exclude evidence that would confuse issues and distract the attention of the jury 'from the primary to [the] collateral issues.' *Geesey v. Albee Pennsylvania Homes Inc.*, 211 Pa.Super. 215, 223, 235 A.2d 176, 180 (1967). *Furthermore, the exclusion of evidence may not be grounds for a new trial* where said evidence would not have affected the verdict or *where other evidence of the same fact was introduced by the party applying for the new trial. Rankin v. Boyle,* 328 Pa. 284, 195 A. 36 (1937); *Rudella v. Lofland,* 213 Pa.Super. 305, 247 A.2d 792 (1968).

> In the instant case, *Dr. Robinson,* who was a defense expert witness, testified that four days prior to trial, plaintiff had told him at a psychiatric examination that she remembered nothing concerning the accident. He also stated that her form of amnesia would have brought about total recall within 30 days or not at all. This *testimony was in direct contradiction to plaintiff's testimony* that she began recalling things in 1968, and seemed to raise a serious question as to the credibility of the plaintiff and her true recollection of the accident at time of trial. *As impeaching evidence, Dr. Robinson's testimony was potentially devastating.* Despite this, the jury found plaintiff to be more credible. This was totally within its province to do so. *As Dr. Robinson's testimony went to essentially the same facts and issues as the offered evidence of the pre-trial statement, the trial court properly refused to admit what would have amounted to cumulative evidence. A new trial should not be granted on the basis of the excluded evidence.*" (Emphasis added) *Id.*, 226 Pa.Superior Ct. at 391, 313 A.2d at 756; *accord*

*Billings v. Upper Merion Township Authority,* 44 Pa. Cmwlth. 622, 625, 405 A.2d 967, 970 (1979).

Instantly, the content of the exhibits sought to be admitted into evidence, as with the testimony of Dr. Robinson in *Eldridge,* was not supportive of appellant's version of the case—i.e., "stepping into a hole prior to being struck by the tractor-trailer." As such, the evidence ("Exhibits") clouded appellant's credibility regarding the events surrounding the accident. However, since the content of the hospital records "went to essentially the same facts and issues as the . . . evidence . . . [of the insurance Exhibits sought to be utilized by Terminal for impeachment purposes], the trial court properly refused to admit what would have amounted to cumulative evidence." *Id.* Furthermore, counsel for appellee cross-examined the appellant regarding the circumstances attendant to his injury; e.g., did appellant step into a hole or did his foot slide under the rear wheel of the tractor-trailer? Appellant's ambivalence on the matter, when coupled with the content of the hospital records—DT–19B through DT–19F, affected his credibility. Ergo, appellee, as we view the record, suffered no prejudice as a result of the trial judge's ruling. *See generally Poulson v. Gamble,* 197 Pa.Super. 300, 305, 178 A.2d 839, 842 (1962). If such were not the case, we would find to the contrary. *See Panik v. Didra,* 370 Pa. 488, 88 A.2d 730 (1952).

In view of the above, without discussing the correctness of the other reasons proffered by the trial court in refusing appellee's request, *see supra* note 7 and accompanying text, we cannot say that the court *en banc* did not abuse its discretion in awarding a new trial.

Order of the court *en banc* denying the judgment n.o.v. is affirmed; the order of the court *en banc* granting a new trial is reversed with direction that judgment be entered on the verdict.

DiSALLE, J., did not participate in the consideration or decision of this case.