513 A.2d 455

**Harold LEFCOURT, a/k/a Hal Lefcourt**

v.

**Seymour SHORE and Bunny Shore, H/W, Appellants.**

Superior Court of Pennsylvania.

Argued March 11, 1986.

Filed July 31, 1986.

William E. Benner, Doylestown, for appellants.

Robert L. White, Langhorne, for appellee.

Before WICKERSHAM, WIEAND and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal from the judgment of $19,800.00 entered following a jury trial against the appellants/defendants, Seymour and Bunny Shore.   We affirm.

We are asked to review the denial of the appellants' motion for a new trial and/or judgment n.o.v.   In doing so, as to the judgment n.o.v. claim, we first must view the evidence, as well as any reasonable inferences that can be drawn therefrom, in a light most favorable to the verdict-winner.   *McDevitt v. Terminal Warehouse Co.*, 304 Pa.Super. 438, 450 A.2d 991 (1982), allocatur denied.

The record reveals that in early April of 1982 Mrs. Shore contacted Mr. Lefcourt, the public relations officer for Bucks County and someone she and her husband had known for some 25 years, to ask him to do what he could to stop an organization from buying a piece of property (known as the Klein Building) and starting a business that would compete with their operation (a flea market known as Super Flea, Inc.). Lefcourt agreed to act on their behalf, but he wanted to be paid a fee for his services. Mrs. Shore stated that her accountant (Arthur M. Pollock) would draft a letter to that effect and mail it to him for his perusal. Such a letter, dated May 12, 1982, was forwarded to Lefcourt and provided, in relevant part:

Dear Harold:

I have been authorized by my client the "Shores" to offer to you, for them, the following financial arrangements for your services in regard to the ... [Klein] property.

Should your efforts result in the "Shores" obtaining a lease on the ... [Klein] property, the "Shores" will pay to you a fee equal to ten percent (10%) of the first year lease rental exclusive of any rent paid for utilities, taxes, insurance or maintenance, etc. over a twelve month period from the date of execution of the lease.

*    *    *    *    *    *

Should you have any questions in regard to this matter, please give me a call.

Prior to receipt of the letter, Lefcourt had completed a meeting with the township manager and secured the address of a New Jersey-based group (counselled by a Mr. November) interested in the property. He also learned that the group had merely made "an inquiry" and not a proposal. Upon communicating these facts to Mrs. Shore, Lefcourt outlined what he intended to do, i.e., he was going to get in touch with the people involved and "discourage them from coming in initially". Additionally, this was the first he learned that the Shores desired ownership of or a lease to the Klein Building. He informed Mrs. Shore that he would

use, as he put it, his "public relations efforts" to help in this endeavor since he knew the owner of the building (a Meshulam Riklis, Chairman of the Board of Rapid American Corporation).

Soon after Lefcourt's conversation with Mrs. Shore, Mr. November was phoned several times. During the course of these calls, Lefcourt advised November of the Shores' position, and their willingness to take the matter to court if need be to postpone the New Jersey group's securement of the property in question. November, in turn, informed Lefcourt that he represented a corporation with two million dollars in assets and it was prepared to make a "serious proposal and they were negotiating ... with Rapid American". When Lefcourt sought to have a meeting and discuss the Klein issue even further, Mr. November acknowledged his acceptance at first, but, thereafter, the concern waned and Lefcourt heard from him no more.

Sometime in May of 1982, Lefcourt brought into the picture a Mr. DeMauro, the division manager for a real estate concern known as "Previews". Lefcourt told DeMauro that he represented the Shores and asked whether DeMauro would accept them as clients. It appears that DeMauro held the exclusive listing on the Klein Building at various times for Rapid American. Lefcourt knew this from his dealing in 1981 with Rapid American, on behalf of the Bucks County Commissioners, in regard to the same piece of property.

When the question of the payment of any commission or referral fee came up, Lefcourt gave the name of Matthews and White as the law firm he was associated with in this area of public relations, and to which such matters should be directed. DeMauro arranged to forward any commissions due, as a result of any agreement between the Shores and Rapid American, to the law firm.

By letter dated June 10, 1982, Pollock asked Lefcourt to arrange a meeting with Riklis. Lefcourt called DeMauro and told him, as the realtor, to contact Mr. Ackerman, a vice-president in charge of real estate for one of Rapid

American's wholly-owned subsidiaries and the son-in-law of Riklis. Mrs. Shore was informed of the arrangements being made.

A meeting in New York was conducted, either in the latter part of June or in the early part of July of 1982. Because Lefcourt was not able to attend, DeMauro asked, inasmuch as it was Lefcourt's responsibility to represent the Shores' public relations interest by establishing a link to Riklis, to have a letter of introduction for the Shores prepared by Lefcourt. This occurred (see Exhibit P–4) and was felt by DeMauro to be necessary since the November group, "based on their numbers and their history of operations[, was] a stronger client or prospect to purchase or lease the situation than the Shores at that time ...." Even Mr. Ackerman acknowledged his discussions with the November group, through a New York amalgam of individuals, and the consideration given to all interested parties involved in acquiring the Klein property.

After the meeting in New York, but before July 5, 1982, Mrs. Shore phoned Lefcourt to say, "... you have to do something, we want to move in September with a date ... Could you please call your friend Meshulam and tell him." Lefcourt phoned Riklis' office and spoke to his secretary about the Shores' request and asked if anything could be done. The next thing Lefcourt knew, the Shores were making improvements to open in September. A lease had been obtained by the Shores, with the first ten months rent being credited by Rapid American toward the costs expended by the lessees to renovate the Klein property. Lefcourt received an invitation to attend the grand opening.

By October of 1982, Lefcourt had yet to receive any remuneration for his services. When he inquired about his 10% fee, which he calculated to be $19,200.00 (10% of the $192,000.00 yearly rent due Rapid American), the Shores scheduled a meeting for November 3 or 4 to discuss payment.

The Shores, and another interested party in the joint venture, queried Lefcourt as to what he had done, if any-

thing, to facilitate the leasing of the Klein property. As far as the Shores were concerned, Lefcourt had not lived up to his part of the bargain in failing to attend the meetings in New York with Rapid American and not having Riklis present during these sessions. But, when Lefcourt recounted what he had done (behind the scenes), the Shores conceded that they owed him something and offered to pay him $3,200.00.

Lefcourt, indignant over the whole turn of events, left and, thereafter, commenced the present law suit. After a three-day trial, a jury found in favor of Lefcourt and awarded him $19,800.00. This timely appeal followed.

Of the three issues raised by the Shores, we find it necessary to address only one, and do so because of its novelty in this jurisdiction. The remaining issues were properly dealt with by the trial court in its opinion to us, and we adopt it as our own for allocatur purposes.

To start with, the Shores admit that subsection (5) of the Real Estate Licensing and Registration Act (63 P.S. § 455.201) exempts an individual dealing in *public relations* from having to meet the licensing requirements of this Commonwealth so as to entitle him/her to receive compensation normally reserved for those engaged in the field of brokering real estate.

However, the Shores argue, the exemption to the licensing stricture is lost when a public relation's person does something other than *promote* his client's real estate. They believe that "when a public relation's person is involved in negotiating with or aiding any other person in *obtaining* real estate, ... that falls under subsection 1 and the exemption does not apply." (Emphasis added) Thus, they urge, Lefcourt was acting as an unlicensed "real estate broker" in violation of the Act, and this licensure deviation relieved them of the obligation to pay him anything.

The definition portion of the Act reads:

"**Broker.**"  Any person who, for another and for a fee, commission or other valuable consideration:

(1) negotiates with or aids any person in locating or obtaining for purchase, lease or acquisition of interest in any real estate;

(2) negotiates the listing, sale, purchase, exchange, lease, time share and similarly designated interests, financing or option for any real estate;

(3) manages or appraises any real estate;

(4) represents himself as a real estate consultant, counsellor, house finder;

(5) undertakes to promote the sale, exchange, purchase or rental of real estate: Provided, however, That this provision shall not include any person whose main business is that of advertising, promotion or public relations; or

(6) attempts to perform any of the above acts.

63 P.S. § 455.201.

Giving subsection (5) a common-sense interpretation, as gleaned from the scheme of the Act at large and the provision in particular (see 1 Pa.C.S. §§ 1921, 1922), we read its plain language to embrace the use of an individual's talents in the area of public relations, be they for the benefit of a client-lessor/lessee or seller/buyer.  As astutely discerned by the trial court, this extrapolation is feasible "because the [sub]section talks about sale or purchase so it is talking about both sides of the transaction."  Accordingly, we find Lefcourt's conduct insulated from assault and not violative of the licensing portion of the Act.

To explicate, Lefcourt was employed by Bucks County as a certified public relations counselor, and he maintained his own public relations firm as well.  Because it was common knowledge in the community that he was friends with Riklis and was a person who could "control the destiny of things", it was in this posture that the Shores approached Lefcourt to "ask him if he could arrange a meeting with Meshulam Riklis."  He was to use his "best efforts" to accomplish this task so that the Klein Building could be attained, but "he

was not to obtain it." This would be left to others, as confirmed by the Shores' accountant, Pollock. In particular, Pollock testified that Lefcourt was "being asked to promote the Shores' interest with Mr. Riklis", and to bring to the Shores "his background and experience." As for how Lefcourt intended to carry-out this public relations project, neither Pollock nor the Shores were privy to the specifics involved. Mrs. Shore stated it this way:

... he was going to do what he could to get the building. He didn't tell us where he was going or when he was going [,] but he said he was going to do different things to get us the building.

To the same effect, Pollock remarked:

... he [Lefcourt] was going to use his efforts to obtain it. Now, whether it meant going to the president of the company or maybe sometimes you are better off talking to a secretary or to a vice-president and if the results are accomplished for my client then I feel that the letter [of introduction prepared by Lefcourt and given to DeMauro] served its purpose.

Even the realtor, engaged to help the Shores formalize the proposal to present to Rapid American, stated that Lefcourt was representing the Shores' public relations interest in the transaction.

The fact that Lefcourt may not have been present or involved in the meetings leading up to the acquisition of the property does not diminish his role in getting the matter on track and moving the parties, vital to the success of the project, together. Curiously enough, Lefcourt's lack of involvement in the negotiations is at the crux of the Shores' complaint that a fee need not be paid. However, this exact lack of involvement renders the appellation of "real estate broker" inapposite to Lefcourt so as to enhance his claim as a public relations man for the Shores. See generally *Wilkins v. Heebner*, 331 Pa.Super. 491, 480 A.2d 1141 (1984).

Under the law of contracts, we believe that Lefcourt is entitled to payment for his services. First, the Shores *offered* Lefcourt a fee for aiding in the proposed secure-

ment of the Klein property, the specifics of which were never itemized. Second, Lefcourt *accepted* the offer. Third, Lefcourt provided *consideration* in the form of services outlined *supra*.[1] Therefore, we find the agreement, reduced to writing on May 12, 1982, is enforceable so as to entitle Lefcourt to compensation. See Corbin on Contracts, §§ 2–7 (1952). Likewise, in conjunction with the appropriate standard of review (see *McDevitt v. Terminal Warehouse Co., supra*), we have examined the Shores' motion for new trial and find it to be unpersuasive.

Judgment affirmed.

**1.** We would add, since it is not discussed in the earlier part of the opinion, that Lefcourt testified that he phoned Ackerman in the initial stages of the venture. He was told then by Ackerman not to bring anyone to him (Rapid American) who did not have the financial resources to complete the proposed deal.