560 A.2d 212

Jeffrey BLUM, a Minor by his Parents and Natural Guardians, Joan and Fred BLUM and Joan and Fred Blum, in Their Own Right, Appellees,

v.

MERRELL DOW PHARMACEUTICALS INC. and Rite–Aid Pharmacy.

Appeal of MERRELL DOW PHARMACEUTICALS, INC.

Jeffrey BLUM, a Minor by his Parents and Natural Guardians, Joan and Fred BLUM and Joan and Fred Blum, in Their Own Right, Appellants,

v.

MERRELL DOW PHARMACEUTICALS INC. and Rite–Aid Pharmacy, Appellees.

Jeffrey BLUM, a Minor by his Parents and Natural Guardians, Joan and Fred BLUM and Joan and Fred Blum, in Their Own Right, Appellants,

v.

MERRELL DOW PHARMACEUTICALS INC. and Rite–Aid Pharmacy, Appellees.

Jeffrey BLUM, a Minor by his Parents and Natural Guardians, Joan and Fred BLUM and Joan and Fred Blum, in Their Own Right, Appellees,

v.

MERRELL DOW PHARMACEUTICALS INC. and Rite–Aid Pharmacy.

Appeal of MERRELL DOW PHARMACEUTICALS, INC. ("MERRELL DOW").

Superior Court of Pennsylvania.

Argued Dec. 13, 1988.

Filed June 14, 1989.

152

Joseph E. Conley, Jr., Philadelphia, for appellant (at 1813, 2016) and appellees (at 1866, 1867).

Thomas R. Kline, Philadelphia, for appellees (at 1813, 2016) and appellants (at 1866, 1867).

Before CAVANAUGH, POPOVICH and HOFFMAN, JJ.

POPOVICH, Judge:

This case involves cross-appeals from the orders of the Court of Common Pleas of Philadelphia County, all reduced to judgment, challenging the entry of delay damages (at Nos. 1866 & 2016 PHL 1988), the grant of Rite Aid Pharmacy's judgment n.o.v. (at No. 1867 PHL 1988), and the denial of a judgment n.o.v. and/or a new trial by Merrell Dow Pharmaceuticals, Inc. (at No. 1813 PHL 1988). We reverse in part and affirm in part.

Our inquiry starts with the judgment n.o.v. allegation, and, as a result, we must view the evidence in a light most favorable to the verdict-winner. *McDevitt v. Terminal Warehouse Co.*, 304 Pa.Super. 438, 450 A.2d 991 (1982). Under such a standard, the evidence reveals that Joan Blum was prescribed Bendectin in February and March of 1980 by her obstetrician for treatment of nausea and vomiting ("morning sickness") during the first trimester of her pregnancy.

In September of 1980, Mrs. Blum gave birth to a son (Jeffrey) diagnosed as having a "severe" case of *talus equinovarus* (bilateral "clubbed feet"). Thereafter, a complaint in trespass was filed against the manufacturer (Merrell Dow) and distributor (Rite Aid) of the drug, asserted by

the Blums to be the direct and proximate cause of Jeffrey's deformity. The theories of recovery encompassed claims based on, *inter alia,* negligence, strict liability, breach of express and implied warranties, and fraud and misrepresentation of the testing and marketing ("labelling") of the drug's efficacy.

The 44–day trial (which generated over 4,000 pages of testimony) began with the appearance of Doctor Alan Kimball Done, a specialist in the field of pediatrics. He testified to conducting an examination of Jeffrey, perusing all the medical records and the deposition testimony of the attending orthopedic surgeons. He testified to relying upon the structure/activity of the drug, as well as *in vitro,* animal and epidemiologic studies in reaching his conclusion that Bendectin is a teratogen (causes or increases the risk of birth anomalies) in humans, and, to a degree of reasonable medical certainty, was "capable of contributing to the formation of Jeffrey's limb malformation[;]" there "being no reasonable likelihood . . . that there could be any other basis for explaining it."

As for the Bendectin label, Doctor Done believed that it contained misinformation by citing the incidence of birth defects in offspring as being no higher in women who ingested the drug when compared to those who were not exposed. His review and interpretation of the studies indicated otherwise. Moreover, because Merrell Dow's Unisom label read that it was "contra-indicated in women who were pregnant or nursing", the same warning should have appeared in the Bendectin packaging since both drugs contained doxylamine succinate, thought by Doctor Done to be the teratogenic component. Accordingly, it was the witness' opinion that the standard of pharmaceutical care in 1980 required Merrell Dow to list the hazards associated with Bendectin, *i.e.,* it should not have been used during pregnancy, on the labelling material. Merrell Dow's failure to warn of the "high degree of risk of harm", associated with the ingestion of Bendectin during pregnancy, was felt

by the witness to be inconsistent with the information available on the drug's teratogenic qualities.

The next expert to testify was a Doctor Gross. He subjected Merrell Dow's data and animal studies to analysis to determine whether the results were statistically significant (had "power"), such that Bendectin could be considered the cause of the increase in birth defects; in other words, was the drug a teratogen? He decided it was, and he stated his position thusly;

> ... the overall conclusion is that in each of the studies, the agent on test, which was either bendectin, the three ingredients, bendectin or doxylamine succinate or one of its ingredients, can be regarded as teratogenic, in that it should be regarded as teratogenic, in that it significantly affects and it increases the frequency of birth defects, resorption, death, in the totality of all of these studies ... in sum total adds up to the same picture. * * * These agents interfere with normal development of the young.

Further, it was the contention of Doctor Gross that Bendectin was "clearly, without any question, a marked, significant teratogen" that should not have been marketed for use during pregnancy.

Doctor Gross also considered the 1980 Bendectin label to be "false" in discussing the absence of any "drug-induced fetal abnormalities" occurring at levels of up to ninety times the maximum human dose. His review of the evidence indicated, "unequivocally", that the drug should be branded a teratogen. Although the witness conceded he did not review any epidemiological studies on the subject, he was still able to "extrapolate" the risk Bendectin posed to humans from the animal studies performed. Similarly, he was unaware of any drug found to cause birth defects in animals, which, upon investigation, did not cause birth defects in humans.

Doctors Done and Gross held fast to their opinions—despite the flaws which plagued some of the studies they relied upon and the existence of a body of contrary views

held by others in the field as to Bendectin's teratogenic attributes—that Bendectin caused Jeffrey's clubbed feet.

Other witnesses to testify on behalf of the plaintiffs included Mr. and Mrs. Blum, their obstetrician, the two orthopedic surgeons who operated on Jeffrey and the pharmacist who filled Mrs. Blum's prescription. Thereafter, the plaintiffs' case came to a close and the presentment of a motion for non-suit was denied.

The defense's side of the case started with the presentment of the deposition testimony of Doctor Herschel Jick, a clinical pharmacologist, who collected data on Bendectin and other drugs to see if they were producing any abnormalities in the children born to women who took the drug(s) during pregnancy.

The time-frame for Jick's study covered July of 1977 through December of 1979. The results, published in the Journal of the American Medical Society in July of 1981, were that there was no "strong" association between the use of any of the drugs and all congenital disorders.

To the extent that the study initially showed a statistically strong association between Bendectin and some of the deformities, it was discovered that this occurred as a result of a disorganization in the data, which, upon examination of additional (future) data, evidenced no nexus between Bendectin and the minor limb disorders that were excluded, correctly, from the study.

Doctor Jick did state, however, that:

... there really isn't a large enough or complete enough study to rule out at all a teratogenic effect with this, or any other drug. * * * The best we can do is present the results as we have them in an undisputed manner as possible and *everybody has to decide from their own point of view whether, is the evidence here for or against the effect of the drug.* (Emphasis added)

In Jick's opinion, the data did not show Bendectin having an adverse effect on developing limbs. However, he did caution "one cannot rule out from these data a small effect."

The second expert to appear on behalf of the defense was Doctor Paul E. Stolley, a specialist in the science of epidemiology (the study of the distribution and determinants of disease in human populations). He reviewed 30–35 studies (cohort and case control) and found that there was no correlation between congenital malformations and Bendectin. As stated by Doctor Stolley:

Bendectin has not been shown ... to be associated with any particular birth defect; and what is, perhaps, more important, no causal relationship can be inferred from the occasional associations that have been shown in some studies, but not confirmed in others.

Doctor Peter Mamunes, board certified in pediatrics and endocrinology, was the next expert to take the stand. He did a genetic evaluation of Jeffrey and his parents. His opinion, within a reasonable degree of medical certainty, was that Bendectin did not cause Jeffrey's condition. On cross-examination, Doctor Mamunes repeated his position that Jeffrey had multifactorially inherited clubbed feet, and he was predisposed to some environmental event (meaning anything other than a genetic cause) *in utero*, which resulted in his abnormality.

Doctor Mamunes was of the belief that Bendectin could not cause clubbed feet, and he was never impressed by the literature to lead him to believe that Bendectin should not be administered during pregnancy. Nonetheless, the doctor agreed with counsel for the plaintiffs that:

... in the medical literature, there is a suggestion of at least a possibility of an association of bendectin and some congenital malformations as reported in some of the epidemiologic studies.

Further, when Doctor Mamunes was asked by plaintiffs' counsel whether he would consider Bendectin "totally safe", the witness responded that he would not use such terms to describe any drug, including Bendectin. Thus, to the inquiry: "If you can't be absolutely certain that any drug is totally safe, then we can't be absolutely certain about

bendectin as one of the drugs?" the witness answered: "That's correct."

In regard to the basis for the belief that Bendectin was safe, Doctor Mamunes relied upon a series of textbooks; one was by the author Briggs. Yet, on cross-examination, plaintiffs' counsel elicited from the witness that, during his earlier deposition, he had agreed with the last paragraph in the 1986 edition of Briggs' textbook, which read:

> Although the literature supports the relative safety of this product [Bendectin] when compared to the normal background of malformations, it is not possible to state that it was completely without risk to the fetus.

As to Doctor Mamunes' diagnosis of Jeffrey having Ehler–Danlos syndrome, which exhibits itself by hyperextensibility of the skin and joints, the witness admitted:

> [He] only had the opportunity to examine [Jeffrey's] hands and his arms and his fingers because his feet and legs were in casts. So it was very hard to be certain [as to his diagnosis], when only examining one part of the body. . . .

In response to the question whether drug ingestion alone could cause birth defects, Doctor Mamunes answered:

> That's a very debatable point. There are lots of—I am not sure that that's true. And I don't think that the literature is clear on that. Because there are many people who take that same drug [—Bendectin—] and have no problem with their offspring and other people who do have problems with that drug, and the offspring who is malformed.

The defense continued with its parade of experts by presenting Doctor James Lee Goddard, former chief of the Communicable Disease Center in Atlanta. He opined that Merrell Dow complied with the standards that existed in the pharmaceutical industry at the time (1966) it submitted its then new drug application to the Food and Drug Administration for Bendectin, and that Bendectin was safe for use in human pregnancy. Next in line was a Doctor Brent, an epidemiologist, who reviewed the literature on Bendectin

and concluded that it caused no reproductive toxicology effects and no birth defects. It was not a teratogen. This was consistent with the beliefs of expert-witness Doctor Hoekenga.

The sixth expert was Doctor Steven Lamm, a specialist in epidemology and a pediatrician by profession, he examined all of the information on hand and pooled the data (with regard to the sales of Bendectin and its correlation to birth defects) to reach his decision that women who take Bendectin are not at an increased risk of having children with any congenital malformations. However, he could not dispute the fact that in certain studies there are statistically significant associations between the ingestion of Bendectin and various birth defects, even though the witness' pooled data did not show a statistically significant association.

Doctor Peter D. Pizzutillo, an expert in pediatric orthopedics, examined Jeffrey's medical records and the available literature in the field. He saw no casual relationship between Bendectin and the resultant clubbed feet. In his opinion, Jeffrey's condition would be considered "idiopathic", a diagnostic term meaning "no identifiable cause for the problem. It is yet to be identified."

The last expert to testify of note was Doctor Richard Skalko, a specialist in developmental and experimental teratology. He found that Bendectin was neither mutagenic (ability of a drug to mutate chromosomes or DNA) nor teratogenic (producing congenital malformations). His review of Merrell Dow's studies failed to evidence the presence of any dose-response, *i.e.*, with an increase in dosage of a drug one would expect an increase in response/effect to the drug treatment. This did not occur.

With the completion of the testimony, the jury was charged and returned a verdict finding Bendectin to be a substantial contributing factor in causing Jeffrey's birth defect, and, as such, Merrell Dow (the manufacturer) and Rite Aid (the supplier of the product to Mrs. Blum) were held liable in the amount of 2 million dollars (in compensatory and punitive damages) to the plaintiffs. Thereafter,

delay damages, in the amount of $30,680.00, were added to the verdict, while Rite Aid was dismissed as a party to the litigation on its motion for judgment n.o.v. With the filing and denial of various post-trial motions, the various orders relating thereto were reduced to judgment and the multiple appeals presently before this Court were perfected.

The initial issue deals with Merrell Dow's contention that its right under the Pennsylvania Constitution to a trial by jury, composed of twelve members, was violated when the court below permitted the case to proceed with eleven jurors, despite its objections.

■ Before addressing the jury-composition issue, we must respond to the plaintiffs' assertion that the matter has not been preserved for appellate review.

The plaintiffs point to Merrell Dow's failure to set forth anywhere in its pleadings a demand for a jury of twelve, let alone a request for a jury trial. The plaintiffs also make reference to an *unrecorded* pretrial conference (held on or about September 18, 1988) as the time when Merrell Dow's counsel agreed to an eight-person jury. See Plaintiffs' Brief at 15. Further, the plaintiffs argue that it was "understood" by the parties that the trial court would begin with twelve jurors and allow the case to go forward with as few as ten jurors if need be, a fact which was admitted, allegedly, by counsel for Merrell Dow when Juror # 3 was excused. *Id.* at 16.

Our review of the record is at odds with the plaintiffs' accounting. For example, the first pleading filed by Merrell Dow, *i.e.,* the complaint in trespass, had on the face-sheet: "JURY TRIAL DEMANDED". This is clearly consistent with the requirements set forth in Pa.R.Civ.P. 1007.-1(a) that a demand for a jury trial is to be made either by endorsement on a pleading (as was the case here) or by a separate writing not later than twenty days after the service of the last permissible pleading. Compare *Stathas v. Wade Estate,* 251 Pa.Super. 269, 274, 380 A.2d 482, 484 (1977); *Cowan v. Rubin,* 28 Pa.D. & C.2d 455, 460 (Phila. Cty.1962). Moreoever, on October 24, 1986, Merrell Dow

demanded in a written submission to the trial court a twelve-person jury with two alternates. Albeit Merrell Dow's request for 12 jurors was granted, no alternates were permitted to be chosen before the case went to trial on December 3, 1986.

As for the plaintiffs' referral to a pretrial conference in which Merrell Dow supposedly acquiesced to a trial composed of less than the twelve-member panel requested, the support for the same is not of record and appears only in the plaintiffs' brief, factors which preclude us from placing any credence in such a statement attributing Merrell Dow with the waiver of its jury-trial argument. This is proper in the face of a barren record, the rectification of which is not accomplished by the plaintiffs' attempt to reconstruct what occurred below. See *McCormick v. Allegheny General Hospital*, 364 Pa.Super. 210, 527 A.2d 1028 (1987); *Hartgraves v. Don Cartage Co.*, 63 Ill.2d 425, 348 N.E.2d 457 (1976).

The course we pursue is proper in the face of transcribed discussions in which the trial court excused Juror # 3 and its proceeding in his absence was objected to by Merrell Dow via a motion for a mistrial. See Reproduced Record at 2265–2275. As such, this ground was not waived. Compare *Love v. Harrisburg, Coca–Cola Bottling Co.*, 273 Pa.Super. 210, 216, 417 A.2d 242, 245 (1979).

We now turn to Merrell Dow's contention that "prejudicial error" occurred in the continuation of the case, over its objection, when Juror # 3 became seriously ill and could not appear for the twelfth day of trial. Such action, argues Merrell Dow, violated its right to a trial by jury guaranteed by Article 1, § 6 of the Pennsylvania Constitution, as amended May 18, 1971; *viz.:*

> Trial by jury shall be as heretofore, and the right thereof remain inviolate. The General Assembly may provide, however, by law, that a verdict may be rendered by not less than five-sixths of the jury in any civil case.

It is the position of Merrell Dow that nowhere does the Pennsylvania Constitution or statute (42 Pa.C.S. § 5104(b)[1]) authorize deliberations by a jury of fewer than twelve where a party/litigant has made an unrelinquished demand for such an empanelment.

Before discussion of any case law on the subject at hand, we will give an overview, from an historical perspective, of the concept of juries of twelve in this Commonwealth, which has its origin in a document introduced and adopted in Pennsylvania in 1682 by William Penn and known as "Laws Agreed Upon in England". Comment, *The Jury Size Question In Pennsylvania: Six Of One And A Dozen Of The Other*, 53 Temple L.Q. 89, 100 (1980).

Penn's other writings discussed the evolution of the jury and his belief that it was a "fundamental" part of the government and important to a free society. However, "nowhere did he endeavor to explain why a jury required twelve members to fulfill its purpose." *Id.* at 103 (Footnote omitted). One commentator has observed:

> ... Penn's own writings and deeds appear to show that his commitment to twelve-member juries was not based on any reasoned notion that twelve was required to assure fairness, but instead stemming from his adherence to traditional common law principles that required twelve-member juries....

*Id.* at 104–105 (Footnote omitted). Likewise, there is very little information available that casts any light on the intent of the framers of the Pennsylvania Constitution of 1776 regarding the size of juries. *Id.* at 106. The same can be said with regard to the Constitutional Conventions of 1790 and 1838. As for the 1873 Convention, discussion was had on the deletion of the unanimity requirement and the elimination of the term "heretofore". Some saw no problem

---

1. Section 5104(b) reads:
    **(b) Civil verdicts.**—In any civil case a verdict rendered by at least five-sixths of the jury shall be the verdict of the jury and shall have the same effect as a unanimous verdict of the jury.

    As amended April 28, 1978, P.L. 202, No. 53, §§ 10(57), 21, effective June 27, 1978.

with this since they *equated a trial by jury with a jury of twelve men,* whereas others believed excising the word "heretofore" would pave the way for a jury of " 'three or five or seven ... [or less than twelve] as a constitutional jury....' " *Id.* at 112–113. The proposal was defeated without explanation.

The framers at Pennsylvania's 1968 Convention did not consider the jury provision at all, believing that it was beyond their jurisdiction to affect that right. See Comisky & Krestal, *Analysis of New Judiciary Article,* 40 Pa.B. A.Q. 68, 77 (1968). Even so, our first Constitution of 1776 contained verbiage which has survived and appears in the present-day Article 1, § 6. *E.g.,* the 1776 Constitution declared that "trials by jury shall be *as heretofore.*" The Constitution of 1790, and the amended ones of 1838, 1873 and 1968, adopted substantially the same provision. Their language was "trial by jury shall be *as heretofore,* and the right thereof remain inviolate." From our reading of the case law, we find that the previous Constitutions were preoccupied with the preservation of a trial by jury, not its extension. See, *e.g., Byers v. Commonwealth,* 42 Pa. 89, 94 (1862); *Pa. Publications v. Penn. Public Utility Commission,* 152 Pa.Super. 279, 290, 32 A.2d 40, 45 (1943), rev'd on other grounds, 349 Pa. 184, 36 A.2d 777 (1944).

It has been written that "[t]he great purpose of the constitution in providing that 'trial by jury shall be as heretofore, and the rights thereof remain inviolate,' was not to contract the power to furnish modes of civil procedure in courts of justice, but to secure the right of trial by jury in its accustomed form before rights of person or property shall be finally decided." *Haines v. Levin,* 51 Pa. 412, 414 (1865). More to the point, in *Smith v. Times Publishing Co.,* 178 Pa. 481, 36 A. 296 (1897), the Pennsylvania Supreme Court was reviewing the claimed excessiveness of a jury's award under the then recently promulgated Act of 1891 authorizing such an inquiry on appeal.

The *Smith* Court, in reversing the judgment and upholding the validity of the Act of 1891 as not an infringement of

one's right to a trial by jury, made some observations which, albeit *dicta*, are germane to our ruling this date; to-wit:

> ... [I]n the constitution ... the phrase "shall be as heretofore" refers to the method of trial itself and means that it shall be preserved with its substantial elements, while the second phrase, "the right thereof shall remain inviolate" refers to the right to a jury trial before the *final* decision in all cases where it would have existed at the time of the adoption of the constitution.
>
>     \*    \*    \*    \*    \*    \*
>
> "Trial by jury is by twelve free and lawful men who are not of kin to either party, for the purpose of establishing the truth of the matter in issue. \* \* \* The definition of a jury ... is ... and all the authorities agree that the substantial features, which are to be "as heretofore," are the number twelve, and the unanimity of the verdict. These cannot be altered, and the uniform result of the very numerous cases growing out of legislative attempts to make juries of less number, or to authorize less than the whole to render a verdict, is that as to all matters which were the subject of jury trials at the date of the constitution, the right which is to remain inviolate, is to a jury "as heretofore," of twelve men who shall render a unanimous verdict. \* \* \* "The constitutional provisions do not extend the right, they only secure it in cases which it was a matter of right before. But in doing this they preserve the historical jury of twelve men, with all its incidents[.]"

178 Pa. at 498–499, 36 A. at 297 (Citations omitted; emphasis in original). Accord *Commonwealth v. Fugmann*, 330 Pa. 4, 29, 198 A. 99, 111 (1938); *Wellitz v. Thomas*, 122 Pa.Super. 438, 440, 185 A. 864 (1936); *Commonwealth v. Collins*, 268 Pa. 295, 299, 110 A. 738, 739 (1920). Thus, we have the unequivocal pronouncement in *Smith* that a "trial by jury" is inextricably linked to the number "12". Given this fact, it is not for Superior Court, as an intermediate appellate court, to alter established law, regardless of one's

argument that the case is *dated.* On this exact topic, this Court, through this writer, has stated its position as follows:

... be it known that, regardless of the vintage of a case or its attack by legal scholars in their erudite treatises on the state of the law, in the final analysis it is for the highest court in this jurisdiction to decide when and to what extent, if any, a case has lost its vibrancy so as to signal its demise. No trial [or intermediate appellate] court is to usurp this function under the guise of changes presaged by the winds of judicial time, marked by the shifting tides of legal thinking.

*Mohn v. Hahnemann Medical College and Hospital of Philadelphia,* 357 Pa.Super. 173, 176, 515 A.2d 920, 922 (1986), reargument denied October 14, 1986.

Although there is no denying that a scrutiny of the Constitutional debates, treatises on the matter and case law leave one without any ("concrete") insight as to the origin of the number 12, there is no doubt that this number was considered an essential element of a jury and was incorporated into our inviolate constitutional right of a trial by jury. See *Fugmann,* supra; *Wellitz,* supra; *Collins,* supra; *Smith,* supra.

■ As an "essential" feature of a trial by jury, the number 12 is implicit in the term "jury" as found in the Pennsylvania Constitution and is not subject to change except by way of a constitutional amendment, or a pronouncement of the Pennsylvania Supreme Court re-examining its initial interpretations of the "jury trial" question and altering its stance as occurred in *Williams v. Florida,* 399 U.S. 78, 102, 90 S.Ct. 1893, 1907, 26 L.Ed.2d 446 (1970), by the United States Supreme Court, wherein it held that the Sixth Amendment did not require a 12–man jury trial in criminal cases, and the fact that the jury at common law was composed of precisely 12 was an historical accident, unnecessary to effect the purposes of the jury system and wholly without significance "except to mystics".

With respect to the need for a constitutional amendment to alter the numerical configuration ("12") of a trial by jury in civil cases, this is not unprecedented when one considers that the unanimity requirement has undergone change. For instance, in 1971, the Legislature adopted language in Article 1, § 6 giving itself the power to promulgate the authorization of a verdict rendered by less than all the members of a jury, *i.e.*, five-sixths of the jury in any civil case. And, attempts to limit the five-sixths majority verdict to those cases where counsel agreed to it were defeated. See 1975 Pennsylvania Senate Legislative Journal at 807–809. This culminated in the codification of the Legislature's efforts in 42 Pa.C.S. § 5104(b), wherein the five-sixths rule was made law and the century-old "inviolate" unanimity requirement was dispensed with. Therefore, since it was necessary to amend the Pennsylvania Constitution in order to grant the Legislature authority to tamper with the essential element of unanimity, it should be no different when it comes to another essential element, the number 12. Compare *State v. Hamm*, 423 N.W.2d 379, 381 (Minn.1988) (similar case except it deals with the question in a criminal context).

█ Furthermore, the cases reviewed by this Court have indicated that, in the absence of stipulation or consent on the record to receive a verdict of less than the constituted number, the verdict of the jury is to be considered a nullity.[2] See, *e.g., Kardibin v. Associated Hardware*, 284 Pa.Super. 586, 598–599, 426 A.2d 649, 655–656 (1981), quoting *Commonwealth v. Beard*, 48 Pa.Super. 319, 324 (1911). Accord *Waldman v. Cohen*, 125 A.D.2d 116, 512 N.Y.S.2d 205, 207–208 (1987); *Hartgraves*, supra; *Brame v. Garwood*, 339 So.2d 978 (Miss.1976); *Bourne v. Atchison, Topeka and Santa Fe Railway Co.*, 209 Kan. 511, 516–519, 497 P.2d 110 (1972); *State ex rel. Polk v. Johnson*, 47 Wis.2d 207, 177 N.W.2d 122, 125–127 (1970); *Johnson v. Holzemer*,

---

2. See Pa.R.Crim.P. 1103 ("Consent To Be Tried By Less Than Twelve Jurors"). If consent is needed to be tried by less than 12 in a criminal scenario, there is no reason to think that the same analogy cannot be utilized in the civil arena.

263 Minn. 227, 116 N.W.2d 673 (1962); see also *Commonwealth v. A Juvenile*, 384 Mass. 390, 425 N.E.2d 294 (1981); Anno., Proper Procedure Upon Illness Or Other Disability Of Civil Case Juror, 99 A.L.R.2d 684 (1965). Because Merrell Dow objected to the continuation of the case when Juror # 3 was excused, we find that the Constitutional right to a trial by jury of twelve members was violated instantly.

To the extent that the plaintiffs proffer *Colgrove v. Battin*, 413 U.S. 149, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973), in support of a contrary view, we find it to be distinguishable. It is true that in *Colgrove*, the United States Supreme Court, on the heels of *Williams v. Florida*, supra, found that a 12–member jury trial in a civil case was not constitutionally mandated by the Seventh Amendment of the United States Constitution.

Unlike *Colgrove*, at bar we have the highest state court interpreting its state's constitution to embrace the approbation of a 12–person jury panel. See *Smith*, supra; see also *Palmer v. Ford Motor Co.*, 498 F.2d 952, 954 (10th Cir. 1974). As a consequence, we find *Colgrove* to be unpersuasive, and, even if we were to hold otherwise, it has been oft-stated that the courts of a state can ascribe greater constitutional protection to its citizenry than does its federal counterpart. See, *e.g.*, *Commonwealth v. Beaver*, 317 Pa. Super. 88, 99, 463 A.2d 1097, 1103 (1983). We do so now on the strength of our Supreme Court's decisions cited supra. And, by doing so, we affirm over 700 years of English common law history since the 12–person jury became established at the end of the reign of Henry II in the 12th century. Concomitantly, we leave the door open for the Pennsylvania Supreme Court to change, if it so decides, its 1891 decision defining what constitutes a jury under the Pennsylvania Constitution.

Because the trial court has acted inconsistently with established, albeit vintaged, case law in this jurisdiction, we need to reverse and remand for a new trial.

Notwithstanding our primary ruling, to the extent that the trial court granted Rite Aid's judgment n.o.v., our review of the facts and law on this aspect of the case

necessitates an affirmance of this segment of the trial court's appealed orders. See *Coyle v. Richardson–Merrell, Inc.*, 372 Pa.Super. 118, 538 A.2d 1379 (1988). As a result, the orders reduced to judgments and appealed at Nos. 1816, 1866 and 2016 PHL 1988 are reversed and remanded for a new trial. However, judgment entered and appealed at No. 1867 PHL 1988 is affirmed.

Judgments reversed in part and affirmed in part. Jurisdiction is relinquished.