J-A19041-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| GARY LANDAU | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JADCO ENTERPRISES, INC. D/B/A | : | No. 3196 EDA 2022 |
| STERLING LIMOUSINE & | : | |
| TRANSPORTATION SERVICES | : | |

Appeal from the Judgment Entered December 16, 2022
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s): 210500641

BEFORE:  BOWES, J., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                    **FILED OCTOBER 3, 2023**

Gary Landau (Landau) appeals from the December 16, 2022 judgment entered in the Court of Common Pleas of Philadelphia County (trial court) following a jury trial in which he was awarded $100,000 in damages against Jadco Enterprises, Inc., d/b/a Sterling Limousine & Transportation Services (Jadco).  We affirm.

**I.**

We glean the following facts from the certified record.  In May of 2019, Landau was injured on a shuttle bus operated by Jadco when a piece of exposed metal on a seat sliced his leg, leaving a scar.  Landau subsequently

_____

[*] Retired Senior Judge assigned to the Superior Court.

experienced a decline in cognitive function. He filed a suit for negligence against Jadco, asserting that it failed to maintain a protective covering over the exposed metal to prevent injury to passengers. He alleged that he suffered from permanent scarring to his leg and that the injury worsened his cognitive faculties, resulting in a permanent decline into dementia. Prior to trial, Jadco stipulated to its negligence and admitted fault for the injury to Landau's leg but denied that the injury was the cause of his dementia.

The parties proceeded to a jury trial on August 8, 2022.[1] Landau presented expert testimony from Dr. Steven Mazlin to establish that the leg injury was the cause of his decline into dementia. Dr. Mazlin reviewed records of Dr. Murray Grossman, a neurologist who performed cognitive testing of Landau on June 4, 2019, as well as medical records from Landau's primary care physician and other specialists he had seen over the years. A nurse working for Dr. Grossman included several notes in his file following the visit, including one approximately three weeks later stating, "[p]atient's lawyers wanted to discuss patient's cognitive changes with Dr. Grossman, specifically asking if the motor vehicle accident could have exacerbated or worsened the

---

[1] We summarize only the testimony related to the decline in cognitive function, as that alleged injury is the basis for Landau's claims on appeal. With the exception of Dr. Mazlin, many of the experts who testified at trial were deposed beforehand, with their testimony presented to the jury by video.

patient's condition." N.T., 8/9/22, at 15-16. She wrote the following note in his file over a month later:

> The patient's head CT shows fairly extensive atrophy in a pattern most consistent with Alzheimer's disease and consistent with the patient's pattern of cognitive difficulty, no evidence of head trauma, no subdural, no cerebral contusion, no petechial hemorrhage, *no evidence that patient's car accident caused the cognitive difficulties at this time*.

*Id.* at 16 (emphasis added). Dr. Mazlin did not review the nurse's notes while developing his expert report before trial. Landau objected to the admission of the contents of the notes at trial and the trial court overruled the objection.

At trial, Dr. Mazlin testified that he met with Landau once in 2021 and once in 2022 and authored reports based on those appointments and his review of Landau's medical records.[2] Based on the history provided to him, Dr. Mazlin testified that Landau experienced a "precipitous decline" in cognitive function immediately after sustaining his leg injury, when previously he had shown at most minimal cognitive impairment. *Id.* at 40. He had difficulty forming sentences, fumbled over words, was unable to identify common objects and had poor short-term memory. He also struggled with simple arithmetic and abstract reasoning. Dr. Mazlin diagnosed him with dementia. After reviewing extensive medical records, Dr. Mazlin found no evidence that he had been suffering from any cognitive issues prior to the

---

[2] Landau was in his mid-seventies at the time of trial.

injury. The first indication of cognitive issues was observed four days after the accident when Landau's primary care physician observed some memory problems during an exam. Dr. Mazlin opined that the acute stress of the leg injury and subsequent treatment "directly magnified [Landau's] symptoms of mild cognitive impairment to the degree that he was now in a state of dementia." *Id.* at 51. He testified that because Landau had not recovered within six months, the dementia was permanent.

On cross-examination, Dr. Mazlin agreed that Landau's dementia was not caused by the leg injury itself. *Id.* at 86. He said that dementia is usually a progressive disease but occasionally patients, such as Landau, present with a more acute decline. He testified that a CAT scan performed 11 days after the leg injury revealed some atrophy that was usual in elderly individuals and not attributable to the injury. When asked about Dr. Grossman's records, Dr. Mazlin opined that some of the medical history contained in his records was incorrect, though he agreed that the testing Dr. Grossman had performed was generally accurate. He believed that but for the leg injury, Landau would not have declined from mild cognitive impairment into dementia for many years. Dr. Mazlin testified that he did not review the notes made by Dr. Grossman's nurse until the morning of trial and that he disagreed with the opinion expressed in the nurse's notes.

Dr. James Millard, Landau's primary care physician, testified by video deposition. He had been Landau's doctor since 1998 and saw him regularly

until shortly after the accident. Dr. Millard testified that he never had concerns about Landau's cognitive function prior to the accident and said he would have performed an evaluation if he had noticed any issues. He saw Landau for an appointment approximately two months before the accident and did not note any new medical issues, though Landau mentioned some mild back pain and muscle spasticity that was not cause for significant concern. The first time he noted any memory issues was on May 15, 2019, when Landau and his partner came into the office after the accident. At that time, Dr. Millard performed a short cognitive evaluation. Landau scored 26 out of 30 points on the test, which Dr. Millard testified indicated a cognitive deficit. He then ordered a CAT scan to determine whether Landau had suffered any injury to his brain, prescribed a medication for the treatment of Alzheimer's disease and referred him to a neurologist. He disagreed with Dr. Grossman's notes, which had identified a two-year history of cognitive difficulties.

At trial, Landau also sought to admit testimony from Varsha Desai, a nurse and certified life care planner, about the cost of Landau's long-term care following his dementia diagnosis. The trial court excluded the testimony about future costs as speculative but ruled that testimony about Landau's past medical expenses was admissible. After the trial court's ruling, Landau elected not to present Desai as a witness.

Jadco presented Dr. Brad Klein, a neurologist, as its medical expert. Dr. Klein testified based on his review of Landau's medical records from before

and after the accident, as well as Dr. Mazlin's report. Dr. Klein opined that the leg injury did not impact the progression of Landau's dementia, but did impact the symptoms of dementia he experienced at the time of the incident. He testified that Alzheimer's disease results from a slow degeneration and atrophy of the brain over time. He testified that it was common for patients with Alzheimer's disease to development significant cognitive symptoms in response to medical conditions that would not be cause for concern in a younger patient. As a result, he concluded that the stress of the leg injury did not trigger the progression of Landau's dementia but merely created additional symptoms that were not present when he was not under that stress.

Based on his review of the examination performed by Dr. Millard in the days after the incident, Dr. Klein opined that Landau was experiencing only mild cognitive impairment at that time. According to Dr. Grossman's records, Landau had been experiencing difficulty with comprehension, memory, executive function, visuospatial functioning and decision-making for two years. He viewed this as evidence of a progression of cognitive decline over that time. He noted that Landau's CAT scan after the accident showed atrophy in his brain which could not have developed in the short time after the leg injury. He concluded that the degeneration had begun prior to the injury.

In response to Dr. Mazlin's report, Dr. Klein testified that there was no research to support the conclusion that acute stressors cause brain cell death, particularly in patients who have already developed Alzheimer's disease. He

said that stress can cause additional symptoms but would not alter the brain of the patient. He acknowledged that one study found that stress worsened the symptoms of dementia over time but believed that the study was flawed. Based on his research, he concluded that Landau was suffering from mild cognitive impairment and an early progression into dementia at the time of his injury, and his eventual progression into dementia was not caused or accelerated by the leg injury.

On cross-examination, Dr. Klein admitted that he never met with or examined Landau, nor did he speak with any of his family members to obtain a medical history. He considered Dr. Grossman's records to be comprehensive and did not believe he would have gleaned anything additional from meeting with Landau. He also explained that patients or family members are often mistaken about how long cognitive symptoms have been present, as they can present subtly at first and would not be as noticeable as an acute change. He admitted that in 21 years of medical records predating the accident, there was no indication that Landau had previously suffered from any cognitive decline. Dr. Klein admitted that there were discrepancies in the medical histories as reported by Dr. Mazlin and Dr. Grossman, with only Dr. Grossman noting that the cognitive issues were ongoing for a couple of years.

Several of Landau's associates also testified that he had never shown any signs of cognitive decline prior to his leg injury but appeared to develop dementia thereafter. Landau's long-term partner, Toni Rubando, testified that

he had never experienced any cognitive issues prior to the accident and that his behavior after the injury was an immediate cause for concern. When Dr. Millard asked her whether he had cognitive issues in the past, she could only recall two occasions when she had to provide him directions when he got lost while driving. She denied telling Dr. Grossman that he had struggled with cognitive decline prior to the injury.

Following the close of evidence, Landau moved for a directed verdict on the issue of whether the leg injury caused his dementia, arguing that Dr. Klein and Dr. Mazlin had both testified that the stress of the incident worsened his preexisting mild cognitive impairment. The trial court denied the motion.

On the first day of trial, one of the jurors was dismissed due to illness. On the final day of trial, Jadco asked the trial court whether the verdict would require a consensus of nine or ten of the remaining 11 jurors.[3] The trial court responded that nine jurors would be sufficient and Landau did not offer any objection. The trial court repeated during the jury instructions that nine jurors would be required to reach a verdict, and following deliberations, when the jury returned to the courtroom, the tipstaff asked whether it had reached a verdict supported by nine jurors. Landau likewise did not object at either of

---

[3] As discussed in more detail *infra*, Pennsylvania constitutional and statutory law requires a verdict in a civil case to be reached by five-sixths, or approximately 83 percent of the jury. A verdict reached by nine of 11 jurors constitutes 81.8 percent of the jury.

these points. After the verdict was recorded, Landau objected and argued that the verdict must be supported by at least ten jurors. At that juncture, the trial court overruled the objection as waived.

The jury awarded Landau $100,000 in damages for the injury to his leg but concluded that the leg injury did not cause his dementia. The award was supported by nine of the 11 jurors. Landau filed a post-trial motion which the trial court denied. He timely appealed and he and the trial court have complied with Pa. R.A.P. 1925.

**II.**

Landau raises four issues on appeal. First, he argues that the verdict was improper because it was not reached by five-sixths of the jury. Next, he contends that the trial court abused its discretion in two evidentiary rulings: excluding testimony about Landau's future medical expenses and allowing Jadco to cross-examine Dr. Mazlin based on the nurse's notes in Dr. Grossman's files. Third, he contends that the trial court erred by denying his motion for directed verdict on factual cause because Dr. Klein agreed that the leg injury caused Landau's dementia to become more symptomatic. Finally, he argues that the trial court abused its discretion in denying his motion for a new trial based on the weight of the evidence.

**A.**

We begin with Landau's challenge to the number of jurors required to reach a verdict in his case.[4]  The trial court concluded that this issue is waived because Landau did not object to a verdict from nine of the 11 jurors until after the verdict was recorded, even though the matter was discussed on the record before deliberations began.  We agree.

As a general matter, a verdict in a civil case must be rendered by not less than five-sixths of the jury.  *See* Pa. Const. Art. 1, § 6; 42 Pa. C.S. § 5104(b).  However, parties may waive their right to a jury trial as set forth in the Constitution and, in doing so, are "entitled to a trial that comports with the rules of procedure according to which he [or she] has agreed to be tried." *Gianni v. William G. Phillips, Inc.*, 933 A.2d 114, 116 (Pa. Super. 2007) (citing *Ottavio v. Fibreboard Corp.*, 617 A.2d 1296, 1299 (Pa. Super. 1992)); *see also Blum by Blum v. Merrell Dow Pharms. Inc.*, 560 A.2d 212, 219 (Pa. Super. 1989) ("[I]n the absence of stipulation or consent on the

---

[4]

> When assessing the trial court's denial of a motion for new trial, we apply a deferential standard of review.  The decision whether to grant or deny a new trial is one that lies within the discretion of the trial court, and that decision is not subject to being overturned on appeal unless the trial court grossly abused its discretion or committed an error of law that controlled the outcome of the case.

*Gianni v. William G. Phillips, Inc.*, 933 A.2d 114, 116 (Pa. Super. 2007) (citations omitted).

record to receive a verdict of less than the constituted number, the verdict of the jury is to be considered a nullity."). Moreover, it is well-settled that "issues, even those of constitutional dimension, are waived if not raised in the trial court." *Commonwealth v. Jefferson*, 256 A.3d 1242, 1252 (Pa. Super. 2021) (citation omitted).

In holding that Landau waived his challenge to the adequacy of the verdict, the trial court relied on *Kardibin v. Associated Hardware*, 426 A.2d 649 (Pa. Super. 1981), which involved a civil jury verdict that was supported by nine of 11 jurors. Prior to trial, one of the original jurors became unavailable and the parties agreed to proceed to trial and seek a verdict from at least nine of the 11 remaining jurors. *Id.* at 651. Prior to charging the jury, however, one of the defendants asserted that the verdict should be supported by ten of the remaining jurors rather than nine. *Id.* The trial court declined to alter the earlier agreement and charged the jury that at least nine of the members must agree to the verdict. *Id.* On appeal, we affirmed the trial court, finding the stipulation to a verdict of nine jurors to be valid:

> If the parties to a civil case may validly agree to have their rights determined without any jury or with a jury of eleven or less members, it follows that they may with equal validity consent to accept a verdict arrived at by a specified number of jurors, even that of a bare majority. A party may waive constitutional rights designed for his benefit.

*Id.* at 657 (quoting *Neumann v. Kurek*, 22 N.Y.S.2d 950, 953 (N.Y. Spec. Term 1940)).

Landau emphasizes the mandatory nature of the five-sixths language for a civil jury verdict in our Constitution and the Judiciary Code. *See* Landau's Brief at 26-27 (citing *Oberneder v. Link Computer Corp.*, 696 A.2d 148, 150 (Pa. 1997)). He cites *City of Philadelphia, Police Dep't v. Gray*, 633 A.2d 1090 (Pa. 1993) for the proposition that his objection to an inadequate jury verdict was not waived when it was raised "while the jury was present and when the trial court could correct the error." Landau's Brief at 27. In that case, our Supreme Court held that the plaintiff waived her challenge to an inconsistent jury verdict when she failed to object to the verdict when it was recorded. *City of Philadelphia, Police Dep't*, *supra*, at 1095. It found that the plaintiff was not required to object to the form of the verdict slip before the jury issued its verdict, as the slip was not erroneous on its face. *Id.* Where the inconsistency arose in the jury's answers to special interrogatories, however, the plaintiff was required to timely object prior to the recording of the verdict. *Id.*

*City of Philadelphia, Police Dep't* is inapposite. There, the special interrogatories on the verdict slip were not inherently inconsistent or flawed, so no objection prior to jury deliberations could have corrected any error.[5]

_____

[5] The verdict slip instructed the jury to determine whether two defendants caused the plaintiff's injuries and then to apportion the percentage of negligence between the defendants. The inconsistency arose when the jury found that one defendant was not a causal factor of the plaintiff's injuries, but nonetheless apportioned 25 percent of the negligence to that defendant. *City*
*(Footnote Continued Next Page)*

Landau posits that the error in this case was similarly not apparent until after the verdict was read and the jury was polled, as notwithstanding the trial court's instruction to the jury that the verdict needed to be supported by nine jurors and it could have elected to return a verdict supported by a greater number. However, this argument disregards the fact that Landau failed to object to the initial discussion of the number of jurors required to reach a verdict and to the jury instructions. In *City of Philadelphia, Police Dep't*, no objection would have prevented the inconsistent verdict, as the verdict slip and charge was not inherently erroneous. Here, however, the mathematical error that Landau challenges on appeal was apparent during the initial discussion of the verdict and during the trial court's charge to the jury. Nevertheless, Landau declined to object until after the verdict was recorded.

These circumstances are more akin to the stipulation this Court approved of in *Kardibin*, in which the appellant initially agreed to a verdict from nine of 11 jurors and then later attempted to object based on the five-sixths rule. There, we concluded that the appellant was bound by his stipulation even when he raised his objection *prior* to jury deliberations. Here, where Landau did not raise his objection, despite ample opportunity to do so

---

*of Philadelphia, Police Dep't v. Gray*, 633 A.2d 1090, 1095 (Pa. 1993). Nothing on the face of the verdict slip or in the jury instructions would have given rise to the error.

until after the verdict was formally recorded, the trial court did not err in finding that the objection was untimely. No relief is due.

**B.**

Next, we consider Landau's challenges to the trial court's evidentiary rulings.[6] First, Landau argues that the trial court abused its discretion in excluding the testimony his life care planner regarding future medical expenses as unduly speculative.[7] He maintains that evidence of future

---

[6] We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. ***Czimmer v. Janssen Pharm., Inc.***, 122 A.3d 1043, 1058 (Pa. Super. 2015).

[7] Landau briefly contends that Jadco waived this objection by failing to raise the issue at the time of the deposition. Our review of the record reveals that the parties agreed to reserve all objections until the time of trial, and that Jadco filed a written pre-trial objection to the overall speculative nature of Desai's testimony, which the trial court granted in part and overruled in part by allowing in evidence of current and past expenses while excluding evidence of future expenses. Our Rules of Civil Procedure provide that objections to "the competency, relevancy, or materiality of the testimony are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which was known to the objecting party *and* which might have been obviated or removed if made at that time." Pa. R. Civ. P. 4016(b) (emphasis added). Additionally, "[s]ubject to the provisions of Rule 4016(b), objections may be made at the trial or hearing to receiving in evidence any deposition or part thereof for any reason which would require the exclusion of the evidence if the witness were then present and testifying."

Pa. R. Civ. P. 4020(c). The objection at issue here was a broad challenge to the materiality of the majority of Desai's expert opinion. It was not the type of objection that would have been obviated or removed by the parties at the time of the deposition. Based on the nature of the objection, the relevant Rules and the parties' reservation of objections until the time of trial, Jadco's pre-trial objection to this testimony adequately preserved the issue for review.

medical expenses is admissible and relevant to present to the jury. Because the jury did not find that the accident caused Landau's dementia, any exclusion of testimony regarding future medical expenses was harmless. In any event, the trial court did not abuse its discretion in excluding this evidence.

As Landau argues, evidence of future medical expenses is admissible for a jury to consider when calculating damages:

> It is well-settled that an item of damage claimed by a plaintiff can properly be submitted to the jury only where the burden of establishing damages by proper testimony has been met. In the context of a claim for future medical expenses, the movant must prove, by expert testimony, not only that future medical expenses will be incurred, but also the reasonable cost of such services.

*Chavers v. 1605 Valley Ctr. Pky, LP*, 294 A.3d 487, 498 (Pa. Super. 2023) (emphasis omitted) (citing *Mendralla v. Weaver Corp.*, 703 A.2d 480, 485 (Pa. Super. 1997) (*en banc*)). In *Chavers*, we concluded that the trial court properly excluded testimony regarding future medical costs of knee surgery as speculative when the expert testified that the plaintiff only had a 50 percent chance of needing that surgery. *Id.*

Here, Desai developed a life care plan based on her review of Landau's medical records, an interview with Landau and Rubando and a discussion with Dr. Mazlin. The life care plan was based solely on the cognitive decline Landau suffered after the accident and included expenses for medical management and medication, as well as possible in-home care through the remainder of Landau's life. Desai acknowledged that Rubando currently provides for

Landau's daily needs but provided estimates for various levels of in-home care, ranging from eight hours to 24 hours a day. She stated that she could not determine whether Landau would have needed in-home care if the accident had not occurred and provided a range of different levels of care to account for the different possibilities.[8] She said that Landau currently does not have in-home care, as Rubando and a hired driver have managed all his needs since the accident. On cross-examination, she testified that she could not determine what level of care Landau would need for the rest of his life and that he may have developed the need for in-home care even without the accident. Related to the accident, she testified that he may need "no care or 24 hours of care, somewhere in there." Depo. of Desai, 8/2/22, at 52.

The trial court correctly concluded that this testimony was unduly speculative. Desai explained that she could not predict the level of care that Landau would need as he aged and the estimates she provided varied widely depending on the level of in-home care he would require. Even while testifying to the costs of in-home care, she acknowledged that Rubando had been meeting most of his care needs herself and it was unclear whether professional

---

[8] Desai estimated the cost of lifetime care of eight hours per day plus medical management and medications as $850,382. For 12 hours of care per day, the cost increased to $1,240,932; at 16 hours, the cost was $1,631,482; and for 24-hour care, the estimated cost was $1,436,270. Depo. of Desai, 8/2/22, at 35. Medical management and medications alone were estimated at $469,282. *Id.* at 31.

help would ever become necessary. Even if the jury had found that the injury caused or aggravated Landau's dementia, the trial court did not abuse its discretion in finding that the estimated costs, which ranged from $470,000 to over $1,600,000, were too speculative to be presented to the jury.[9]

## C.

Next, Landau argues that the trial court abused its discretion in allowing Jadco to cross-examine Dr. Mazlin regarding the notes Dr. Grossman's nurse wrote in his file. Relying on **Commonwealth v. Thomas**, 282 A.2d 693 (Pa. 1971), and **Cooper v. Burns**, 545 A.2d 935 (Pa. Super. 1988), he contends that it is improper to allow the hearsay opinion of a non-testifying medical expert into evidence. As the notes in Dr. Grossman's file were a proper basis for cross-examination, Landau is not entitled to relief.[10]

---

[9] Additionally, as noted *supra*, Desai's life care plan was only based on the costs of treating Landau's dementia and did not include any costs related to the physical leg injury. Because the jury concluded that the leg injury did not cause the dementia, the exclusion of Desai's testimony was rendered harmless, as Landau was not entitled to recover those damages.

[10] In its opinion, the trial court held that the notes were properly admitted because they were part of the records that Dr. Mazlin reviewed in forming his expert opinion. Trial Court Opinion, 2/17/23, at 6 (citing **Primavera v. Celotex Corp.**, 608 A.2d 515, 517 (Pa. Super. 1992)). Dr. Mazlin, however, testified at trial that he had not previously read the notes and saw them for the first time on the day of his testimony. N.T., 8/9/22, at 103-04. Nevertheless, it is well-established that we may affirm the trial court on any basis appearing of record. **Plasticert, Inc. v. Westfield Ins. Co.**, 923 A.2d 489, 492 (Pa. Super. 2007).

We addressed a similar issue in **Rafter v. Raymark Indus., Inc.**, 632 A.2d 897 (Pa. Super. 1993), a case in which the defendant's medical expert was cross-examined regarding out-of-court opinions offered by various treating physicians. We held that the treating physicians' conclusions were a proper matter for cross-examination, even when the testifying expert did not review their records in reaching his own opinion:

> The right of cross-examination includes the right to examine the witness on any facts tending to refute inferences or deductions arising from matters the witness testified to on direct examination. Moreover, where a medical expert is cross-examined concerning reports or records which have not been admitted into evidence but which would tend to refute that expert's assertion, it is not an abuse of discretion for the trial court to allow this cross-examination.

**Id.** at 900 (cleaned up). We concluded that questioning about the non-testifying physician's report was "a legitimate attempt at diminishing the impact and reliability of [the expert's] opinion" and thus a proper avenue for cross-examination. **Id.**

**Rafter** is dispositive here. Though Dr. Mazlin testified that he did not read the nurse's notes in preparing his expert report, the notes remained a proper basis for Jadco to impeach Dr. Mazlin's credibility and diminish the impact of his opinion in the case. The notes were written as part of Dr. Grossman's treatment of Landau and bore on the central issue in the case. Jadco was entitled to cross-examine Dr. Mazlin regarding why he did not find those notes persuasive, particularly when Dr. Mazlin relied on the testing Dr. Grossman performed shortly after the accident in developing his expert

- 18 -

opinion. Questioning Dr. Mazlin on the notes that contradicted his opinion was a legitimate means of attacking his opinion and building a defense. The trial court did not abuse its discretion in allowing this avenue of questioning.[11]

**D.**

Next, Landau argues that the trial court erred by denying his motion for a directed verdict on factual cause.[12] He contends that the plaintiff and defense experts agreed that the leg injury caused his decline into dementia

---

[11] ***Commonwealth v. Thomas***, 282 A.2d 693 (Pa. 1971), and ***Cooper v. Burns***, 545 A.2d 935 (Pa. Super. 1988), do not compel a different conclusion, as those cases do not bear on the right of cross-examination. ***See Boucher v. Pa. Hosp.***, 831 A.2d 623, 629 (Pa. Super. 2003) (holding that even when evidence is not admissible under the expert reliance rule or a hearsay exception, it may be the proper basis for cross-examination to refute a medical expert's opinion).

[12]

> We will reverse a trial court's grant or denial of a [directed verdict or JNOV] only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.
>
> There are two bases upon which a [directed verdict or JNOV] can be entered; one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that, even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in his favor. Whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

***Hall v. Episcopal Long Term Care***, 54 A.3d 381, 395 (Pa. Super. 2012) (citation omitted).

and, in light of the uncontroverted evidence, it was improper for the trial court to allow the question of factual cause to be considered by the jury.

Landau maintains that a directed verdict on causation for his dementia was warranted because "[w]here there is no dispute that the defendant is negligent and *both parties' medical experts agree the accident caused some injury to the plaintiff*, the jury may not find the defendant's negligence was not a substantial factor in bringing about at least some of plaintiff's injuries." **Andrews v. Jackson**, 800 A.2d 959, 962 (Pa. Super. 2002) (emphasis added); **see also id.** at 964 ("[W]e conclude the jury must find the accident was a substantial cause of at least some injury, where both parties medical experts agree the accident caused some injury."). In **Andrews**, the medical experts agreed that the plaintiff suffered, at minimum, a cervical strain in the underlying motor vehicle accident, but disagreed over whether other preexisting conditions were aggravated by the accident. **Id.** We concluded that the trial court properly awarded a new trial because the jury was not entitled to "disregard the uncontroverted evidence of causation," even if it ultimately concluded that the resultant damages were minor. **Id.** at 965.

After review of the relevant testimony, we agree with the trial court that Dr. Mazlin and Dr. Klein did not agree on the issue of factual causation, and it was thus proper to submit the matter to the jury. Dr. Klein did concede that the symptoms of Landau's mental impairment increased around the time of his injury, but nonetheless remained consistent throughout his testimony in

his opinion that the injury did not actually cause his mental impairment. Rather, he testified that there was evidence of mild cognitive decline in the two years prior to the accident and that, as a progressive disease, Landau's dementia would have continued to develop over time notwithstanding any injury. In particular, Landau's CAT scan shortly after the incident showed atrophy in the brain that could not have developed in the few days that had passed since the leg injury. Based on this evidence, Dr. Klein concluded that the mild cognitive impairment existed before the leg injury and that the decline into dementia was part of the normal progression of that condition.

Put simply, Dr. Klein acknowledged that stress could temporarily render a patient more symptomatic of existing cognitive issues but did not believe there was evidence in the literature or this case to establish that stress actually causes dementia in an otherwise healthy human. This was a point on which he and Dr. Mazlin disagreed, as Dr. Klein testified that the medical literature did not establish that stress causes dementia in humans while Dr. Mazlin opined that he had treated many patients whose cognitive decline could be traced to incidents of acute stress. The difference between the two expert opinions was a proper matter to reserve for the jury's determination, and the

trial court did not abuse its discretion in denying the motion for a directed verdict on that issue.[13]

## E.

Finally, Landau argues that he is entitled to a new trial limited to damages because the jury's verdict was against the weight of the evidence.[14]

---

[13] Landau also argues that a plaintiff may be entitled to damages when the defendant's negligence aggravates a preexisting injury rather than causes a novel one. Landau's Brief at 42-43 (citing **Offensend v. Atlantic Refining Co.**, 185 A. 745 (Pa. 1936)). As Jadco points out, however, Dr. Klein testified only that the injury may have increased the symptoms of his cognitive impairment around the time of the incident, which the jury was entitled to conclude was the type of temporary or minor harm that was not compensable. Jadco's Brief at 29-30 (citing **Smith v. Putter**, 832 A.2d 1094 (Pa. Super. 2003)).

[14]

> The decision to grant or deny a motion for a new trial based upon a claim that the verdict is against the weight of the evidence is within the sound discretion of the trial court. Thus, the function of an appellate court on appeal is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider *de novo* the underlying question of the weight of the evidence. An appellate court may not overturn the trial court's decision unless the trial court palpably abused its discretion in ruling on the weight claim. Further, in reviewing a challenge to the weight of the evidence, a verdict will be overturned only if it is so contrary to the evidence as to shock one's sense of justice.
>
> ....
>
> A trial court's determination that a verdict was not against the interest of justice is [o]ne of the least assailable reasons for denying a new trial. A verdict is against the weight of the evidence where certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

*(Footnote Continued Next Page)*

- 22 -

His argument on this point, however, is predicated on his contention that the medical experts agreed that the accident caused his dementia. As a result, he contends that the $100,000 damages award was against the weight of the evidence. Because we have rejected his argument that factual cause was uncontested, this claim necessarily fails.[15]

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/3/2023

---

***Chavers v. 1605 Valley Ctr. Pky, LP***, 294 A.3d 487, 496 (Pa. Super. 2023) (citation omitted).

[15] Landau references the jury's confusion on the issue of factual cause during deliberations in support of his position that the ultimate verdict was against the weight of the evidence. While the record reveals some confusion on the causation issue, it is apparent that it was based on an unartfully-drafted verdict slip which did not divide the question of causation into the two categories—leg injury and cognitive decline—that the parties repeatedly referred to throughout the trial. Nevertheless, after a discussion with the trial court, the jury affirmed that it understood its obligation to decide the factual causation issue as to the mental damage only, and it entered a verdict accordingly. ***See*** N.T., 8/11/22, at 97-101. Because the jury was able to deliberate and understand its role after further instruction by the trial court, the initial confusion does not lead us to conclude that the verdict was against the weight of the evidence.